

1  **AKIN GUMP STRAUSS HAUER & FELD LLP**
2  JOHN A. KARACZYNSKI (SBN 93108)
   JOANNA H. KIM (SBN 183799)
   HYONGSOON KIM (SBN 257019)
3  jkaraczynski@akingump.com
   jkim@akingump.com
4  kimh@akingump.com
   2029 Century Park East, Suite 2400
5  Los Angeles, California 90067
   Telephone:   310.229.1000
6  Facsimile:   310.229.1001

7  **BIRD, MARELLA, BOXER WOLPERT,**
   **NESSIM, DROOKS & LINCENBERG, APC**
8  EKWAN E. RHOW (SBN 174604)
   PRESTON H. LIM  (SBN 275249)
9  eer@birdmarella.com
   phl@birdmarella.com
10 1875 Century Park East, Suite 2300
   Los Angeles, California 90067
11 Telephone:   213.687.2640
   Facsimile:   213.827.4200
12
   Attorneys for Plaintiffs
13
   PETER LEE, MIRI PARK, HO SAM PARK,
14 GENEY KIM, AND YONAH HONG

15              UNITED STATES DISTRICT COURT

16      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

17
18 PETER LEE, MIRI PARK, HO SAM        Case No. **CV12- 06618 CBM (JCGx)**
   PARK, GENEY KIM, and YONAH
19 HONG, individuals,
                                        **COMPLAINT FOR:**
20              Plaintiffs,

21      v.                              (1) VIOLATION OF THE UNITED STATES
                                        CONSTITUTION, FOURTEENTH
22 THE CITY OF LOS ANGELES,             AMENDMENT, PURSUANT TO 42 U.S.C §
                                        1983
23              Defendant.
                                        (2) VIOLATION OF SECTION 204 OF THE
24                                      LOS ANGELES CITY CHARTER

25                                      (3) VIOLATION OF ARTICLE II, SECTION
                                        11(a) OF THE CALIFORNIA
26                                      CONSTITUTION

27                                      **DEMAND FOR A JURY TRIAL**

28

Plaintiffs Peter Lee, Miri Park, Ho Sam Park, Yonah Hong, and Geney Kim (collectively, "Plaintiffs"), bring this Complaint against the City of Los Angeles ("City" or "Defendant"), and aver, on information and belief, except as to their own actions, as follows:

## NATURE OF THE ACTION

1.    This action is brought by residents of the Koreatown community of the City of Los Angeles ("the City" or "Los Angeles") to challenge the unlawful and unconstitutional ordinance that the City recently enacted redrawing the Los Angeles City Council ("City Council") district boundaries (the "Redistricting Ordinance").

2.    In particular, by enacting the Redistricting Ordinance, the City redrew City Council District ("CD") 10 for the explicit purpose of increasing the percentage of registered African-American voters in CD 10.  Indeed, an appointee of the Redistricting Commission that drew the new District boundaries acknowledged, both orally and in writing, that his goal in redrawing the boundaries of CD 10 was to "protect the historical African American incumbents in *this district* [CD 10] **by increasing the black voter registration percentage and CVAP [1]#s [citizen voting age population] accordingly**."

3.    In order to do so, the City artificially split Koreatown, a clearly defined, compact and well-recognized community in the Mid-City area of Los Angeles, into two separate City Council Districts ("Districts" or "CDs"), CD 10 and CD 13.  The City refused to incorporate the entirety of Koreatown into CD 10 because doing so would reduce the percentage of registered African-American voters in CD 10.

4.    Furthermore, the City moved certain key and historically African-American neighborhoods from neighboring CD 8 into CD 10.  In doing so, the City ignored the voices of numerous residents of historically African–American neighborhoods in CD 8, which had asked during the redistricting process for their neighborhoods to be kept intact and in CD 8.  The City also jettisoned from CD 10 substantial portions of the

---

[1] CVAP refers to Citizen Voting Age Population.

"Palms" neighborhood in the formerly western portion of CD 10, in which African-Americans were a minority.

5.    In redrawing CD 10's boundaries predominantly for racial reasons, the City unnecessarily ignored key traditional redistricting principles. The City split communities and neighborhoods instead of keeping them whole; it ignored the almost unanimous requests of the public to keep Koreatown whole in a single District and the numerous requests of CD 8's residents to remain in CD 8; and it substantially underpopulated CD 8, as a result of its decision to split apart and move portions of historically African-American neighborhoods from CD 8 to CD 10.

6.    The City has diluted and negatively impacted the voting power of Koreatown residents by unnecessarily, unlawfully and unconstitutionally dividing their community into two separate Districts. The Redistricting Ordinance therefore violates both the United States Constitution and those portions of the Los Angeles City Charter mandating that the City, if feasible, keep neighborhoods and communities whole. Plaintiffs therefore ask this Court (a) to declare the Redistricting Ordinance unlawful and unconstitutional, and (b) to appoint a Special Master to redraw the Districts so that they comply with all applicable laws and Constitutional provisions.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4), 1367(a) and 2201, as well as 42 U.S.C. §§ 1973, 1981, and 1983.

8.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

9.    The City is a municipality located in Los Angeles County.

10.  Plaintiff Peter Lee is a registered voter and a resident of Koreatown in the City and County of Los Angeles. Pursuant to the Redistricting Ordinance, Peter Lee resides in CD 10.

11.  Plaintiff Miri Park is a registered voter and a resident of Koreatown in the City and County of Los Angeles.  Pursuant to the Redistricting Ordinance, Miri Park resides in CD 10.

12.  Plaintiff Ho Sam Park is a registered voter and a resident of Koreatown in the City and County of Los Angeles.  Pursuant to the Redistricting Ordinance, Ho Sam Park resides in CD 10.

13.  Plaintiff Yonah Hong is a registered voter and a resident of Koreatown in the City and County of Los Angeles.  Pursuant to the Redistricting Ordinance, Yonah Hong resides in CD 10.

14.  Plaintiff Geney Kim is a registered voter and a resident of Koreatown in the City and County of Los Angeles.  Pursuant to the Redistricting Ordinance, Geney Kim resides in CD 10.

## FACTUAL ALLEGATIONS

### Background Regarding the Koreatown Community of Los Angeles

15.  The Koreatown community in Los Angeles is a longstanding, well-established and unique ethnic neighborhood in the "Mid-Wilshire" area of Los Angeles. Home to over 120,000 residents, Koreatown is one of the most populous and dense neighborhoods in Los Angeles.

16.  Koreatown is known for its unique cultural landmarks, including festivals, churches, and the hundreds (if not thousands) of Korean-owned businesses, including ethnic markets, restaurants, stores selling traditional Korean goods of all kinds and other businesses frequented by both local residents and tourists.

17.  Korean-Americans make up the largest proportion of Koreatown residents; however, Koreatown is also home to a substantial Mexican-American population as well as other Latino residents.  Many of the Korean-owned businesses in Koreatown draw their customers from the Latino population residing in and around Koreatown.

18.  Like many traditional communities, Koreatown is not defined only – or even primarily – by the varied ethnicity of its residents.  Koreatown is defined instead by its

common cultural and language characteristics, employment and economic patterns, health and environmental conditions, and other common experiences and characteristics shared by its residents and business owners.

19.  Sadly, Koreatown has also been defined by a far less laudable characteristic – the absence of voting power or ability to ensure that the City Council responds to Koreatown's needs.  This is because, for the past forty years, the Koreatown community has been divided into multiple Districts.

20.  The end result has been that Koreatown, while populous and contributing significant tax dollars to several Districts, has not been able to obtain anything close to its fair share of funding.  To this day, Koreatown has no park or recreation center, no athletic facilities, no community center, no performing arts center, no senior citizen housing, and a shortage of affordable housing.

21.  Illustrative of Koreatown's lack of political clout, Herb Wesson, the City Council President and City Council representative for CD 10, recently attempted to merge the community-redevelopment zones for the Mid-City and Koreatown areas, which would have allowed CD 10 to use Koreatown tax dollars to fund projects in parts of CD 10 other than Koreatown.

## An Overview of the Redistricting Process

22.  Section 241 of the Los Angeles City Charter ("Charter") provides for the City to be divided into 15 Districts.  Each District elects a single member of the City Council.

23.  The Charter requires that the District boundaries be redrawn every ten years.

24.  Before 1999, the Charter provided that the City Council would draft the new District maps.

25.  In 1999, following two years of intensive work and substantial public input, two Los Angeles charter reform commissions (collectively the "Commission") made a joint recommendation to substantially amend the Charter.  On June 8, 1999, Los Angeles voters approved the Commission's recommendations.  The amendments

adopted by the residents of Los Angeles included a complete overhaul of the process by which District boundaries were to be redrawn.

26.  In particular, Section 204 of the amended Charter provided for the creation of a Redistricting Commission to create, in the first instance, the new District boundaries.  The Charter provided that each City Council member would appoint one member to the Redistricting Commission; the Mayor of Los Angeles would appoint three members; and the City Attorney and Controller of Los Angeles each would appoint one member.

27.  The Redistricting Commission was required to present its proposed map to the City Council, which was required to finally approve a redistricting ordinance providing for new District boundaries by July 1, 2002 (and every tenth anniversary thereafter).

28.  The amended Charter also specified the criteria by which the Redistricting Commission would determine the new District boundaries.  In particular, the Charter provided that "All districts shall be drawn in conformance with *requirements of state and federal law and, to the extent feasible, shall keep neighborhoods and communities intact, utilize natural boundaries or street lines, and be geographically compact*."

29.    The amended Charter also provided that the Commission "*shall* seek public input throughout the redistricting process."

**City Council's Certification of the Wilshire Center-Koreatown Neighborhood Council to Serve the Koreatown Community**

30.  At the same time that the Commission recommended amendments to the redistricting process, the Commission also answered the question of how neighborhoods were to be defined by recommending the creation of certain neighborhood councils ("Neighborhood Councils") to empower local communities within Los Angeles.  The stated purpose of the Neighborhood Councils was to "promote more citizen participation in government and make government more responsive to local needs."

1    The Commission's recommendations concerning the Neighborhood Councils were also

2    approved by the Los Angeles voters.

3         31.   Specifically, the amended Charter provided for a system by which individual

4    neighborhood councils would apply for and receive certification from the City

5    concerning their respective neighborhoods and neighborhood boundaries.  Each

6    Neighborhood Council would receive funding from the City, have some decision-

7    making authority concerning budgetary and land planning issues, and advise the City

8    concerning issues having unique impacts on the neighborhood in question.

9         32.   Following the approval of the amended Charter, numerous individual

10   Neighborhood Councils began seeking and obtaining certification.  Ninety (90)

11   Neighborhood Councils were ultimately established.

12        33.   On August 5, 2003, the Wilshire Center-Koreatown Neighborhood Council

13   ("WCKNC") was certified by the City to serve Koreatown.  The WCKNC was the 76th

14   Neighborhood Council to be certified out of 90.

15        34.   At the time, the WCKNC boundaries (the "WCKNC Boundaries") were

16   established as follows:

17        (a)   North: Melrose Avenue and Highway 101 (between Wilton and

18              Vermont); 6th Street (between Vermont and Hoover/LaFayette Park);

19        (b)   South: Olympic Blvd. (between Wilton Place and Western Avenue);

20              11th Street (between Western Avenue and Normandie Avenu); Olympic

21              Blvd (between Normandie Avenue and Vermont Avenue); 7th Street

22              (between Vermont Avenue and Hoover Street/LaFayette Park Place);

23        (c)   West: One-half of block or at the alley west of Western Avenue between

24              Melrose Avenue and 11th Street; Wilton between 6th and 7th Streets;

25              and

26        (d)   East: Vermont Avenue (between Highway 101 and 6th Street);

27              LaFayette Park Place (between 6th Street and Sunset Place); Vermont

28              Avenue (between 7th Street and Olympic Blvd.); Elden (between 7th

Street and Sunset Place); Normandie Avenue (between Olympic Blvd. and 11th Street).

35.   Besides the WCKNC, the other generally acknowledged definition of Koreatown is the Los Angeles Times' definition (the "LA Times Boundaries"). The LA Times Boundaries were and are even more expansive than the WCKNC Boundaries.

36.   As of the filing of this Complaint, the Redistricting Commission's website cited only the WCKNC Boundaries and the LA Times Boundaries as defining the relevant neighborhood and community boundaries.

## The Appointment of the Current Redistricting Commission and Instructions by the City Attorney To Respect Communities of Interest

37.   In August 2011, following the 2010 census, the members of the City Council, the Mayor, the Controller and the City Attorney of Los Angeles named their respective appointees to the 21-member Redistricting Commission.   (The members of the Redistricting Commission are referred to herein as "Commissioners.")  By September 2011, the membership of the Redistricting Commission was set.

38.   On September 27, 2011, the Redistricting Commission held its first meeting. At that meeting,  Deputy City Attorney Harit U. Trivedi provided the Redistricting Commission with a "Summary of Redistricting Law and Criteria."  Among other things, the Summary stated that:

    (a)   any new District maps would need to comply with both state and federal law;

    (b)   the City Charter *required* that Districts keep neighborhoods and communities intact to the extent feasible;

    (c)   the Redistricting Commission needed to respect "communities of interest," defined in reference to cultural and language characteristics, employment and economic patterns, health and environmental conditions, and other common issues; and

(d)    the Redistricting Commission could not engage in "racial gerrymandering", meaning race "must not" be the predominant factor in drawing the new District maps and that traditional criteria "must not" be subordinated to consideration of race.

39.    Between September 27 and December 5, 2011, the Redistricting Commission proceeded to hire executive and other staff. In particular, the Redistricting Commission voted to retain as Executive Director Andrew Westall, a senior deputy for City Council President Herb Wesson, the City Councilmember for CD 10. Andrew Westall then proceeded to hire certain additional staff, including public relations workers, to assist the Redistricting Commission.

## **Public Input**

40.    Between December 5 and December 12, 2011, the Redistricting Commission held a series of public hearings, at which the public was invited to comment on the redistricting process. However, *none* of the actual line-drawing took place in public. Instead, the Commission passively received the public's comments at these hearings.

41.    Nonetheless, hundreds of residents and other interest-holders of Koreatown attended the hearings; these residents publicly, and almost unanimously, requested that Koreatown be placed whole into a single District.

42.    Additionally, the Committee heard from hundreds of other residents concerning other neighborhoods. In particular, numerous residents of historically and predominantly African-American neighborhoods in CD 8, including residents of Leimert Park and Baldwin Hills, testified at these same hearings. The vast majority of these residents testified that they wanted their communities to remain undivided in CD 8.

43.    As explained below, in redrawing CD 10 to split Koreatown, the City ignored the stated desires of residents of both Koreatown and African-American neighborhoods in CD 8.

## The Redistricting Commission Divides into "Ad Hoc" Sub-Committees that Draw Maps Entirely out of the Public Eye

44.  As noted above, the City Charter specifically requires that the Redistricting Commission seek public input "throughout" the line-drawing process.  Nonetheless, the Redistricting Commission chose to draw the lines for each of the new Districts entirely in private.

45.  Specifically, at a January 11, 2012 meeting, the Chair of the Redistricting Commission, Arturo Vargas, a Mayor-appointee, proposed that the Redistricting Commission divide into three "Ad Hoc Regional Line Drawing Committees" (the "Ad Hoc Committees"), to correspond to one of three "regions": (1) San Fernando Valley; (2) West and Southwest Los Angeles; and (3) East and Southeast Los Angeles.  Each Ad Hoc Committee would meet on its own and be responsible for drawing an initial map of the Districts in its respective region.  Each Ad Hoc Committee's discussions would be "limited to staff and their own team members."  As noted in Chairman Vargas's report for the January 11, 2012 meeting, this was done to "avoid any Brown Act issues [*i.e.,* the requirement of the Brown Act that legislative decisions be made in public]."

46.  The Redistricting Commission voted, over the objections of a minority of Commissioners, to approve this proposal.

47.  Yet, upon information and belief, the members of the three Ad Hoc Committees did meet with each other to coordinate their efforts to draw the various District boundaries, thereby doing exactly what they claimed to be avoiding – decision-making out of the public eye.

48.  Upon information and belief, before the first meetings of the Ad Hoc Committees, certain members of the City Council and certain members of the Ad Hoc Committees had communicated with each other regarding how they wanted their respective Districts to be drawn.  As a result, upon information and belief, the new boundaries of the various Districts had been decided in secret before the Ad Hoc Committees met.

49.  Upon information and belief, City Council President Herb Wesson, together with Commissioner Chris Ellison and others, agreed before the Ad Hoc Committee meetings began to increase the percentage of African-American registered voters in CD 10 to close to or above 50%.

50.  Upon information and belief, prior to the commencement of the Ad Hoc Committee meetings, City Council President Wesson, Commissioner Ellison and other City Council and Redistricting Commissioners agreed upon the precise boundaries of CD 10 to achieve the goal of increasing the percentage of African-American registered voters in CD 10.  Upon information and belief, these members of the City Council and Redistricting Commission decided those boundaries with the aid of digital data collected and/or maintained by the City concerning the block-by-block racial composition of the neighborhoods in and surrounding CD 10.

**The West/South Ad Hoc Committee Explicitly Redraws the Boundaries for CD 10 on the Basis of Race, Splitting Koreatown into Two Districts**

51.  The Ad Hoc Committee responsible for the "West and Southwest Los Angeles" region (the "West/South Ad Hoc Committee") first met on Friday, January 20, 2012.  The West/South Ad Hoc Committee was responsible for redrawing five districts: CD 4, CD 5, CD 8, CD 10, and CD 11.

52.  At the January 20 meeting, Commissioner Ellison, who had been appointed to the Redistricting Commission by City Council President Wesson (the Council member from CD 10), announced his intention to increase the level of African-American registered voters in CD 10 to over 50% from its 2001 level of 43.2%.

53.  After announcing that his specific (and only stated) goal was to increase the number of African-American registered voters in CD 10, Commissioner Ellison asked the Commission's Technical Director to show on a screen the current CD 10 boundaries overlaid with the African-American demographics for the surrounding neighborhoods.

54.  Using the overlay, Commissioner Ellison proceeded to add to CD 10 numerous neighborhoods adjacent to the former CD 10 boundaries with a majority

African-American population, until African-American registered voters represented over 50% of CD 10's voters (the "Ellison Map").

55.  Commissioner Ellison did so by removing certain landmark African-American neighborhoods from CD 8, including Leimert Park, the "Dons" portion of Baldwin Hills, and other heavily African-American neighborhoods and communities, and moving them to CD 10.

56.  At the same time, Commissioner Ellison removed from CD 10 various neighborhoods in which African-Americans were a minority.  In particular, Commissioner Ellison removed a substantial portion of the "Palms" neighborhood, a densely populated neighborhood in which the Caucasian, Latino, and Asian populations each outnumber the African-American population, from the western portion of CD 10.

57.  In that same line-drawing exercise, Commissioner Ellison excluded from CD 10 all of Koreatown north of Third Street or east of Vermont.  As a result, the Ellison Map excluded from CD 10 roughly 30 percent of the population in the WCKNC Boundaries and even a larger percentage of the population within Koreatown as defined by the LA Times Boundaries.   The remaining portion of Koreatown was placed into CD 13.

58.  Upon information and belief, Commissioner Ellison excluded from CD 10 the remaining portions of the WCKNC Boundaries and the LA Times Boundaries, making Asian-Americans a captive minority of CD 10 in the process, because Commissioner Ellison,Council Member Herb Wesson and/or other members of the City Council and the Redistricting Commission did not want to reduce the percentage of African-American registered voters in CD 10.

59.  Also on January 20, 2012, immediately following the meeting of the West/South Ad Hoc Committee, Commissioner Ellison wrote an email to the other members of the West/South Ad Hoc Committee explaining his rationale in drawing CD 10:

Being a historical African American opportunity district, we found it necessary to increase the AA population. **We attempted to protect the historical African American incumbents in this district by increasing the black voter registration percentage and CVAP #s accordingly.** As you can discern on the attachment, we were able to increase the numbers to 50.12% and 42.8%, respectively. This was a significant increase in black voters in CD 10 which would protect and assist in keeping CD 10 a predominantly African-American opportunity district.

60.  The following day, January 21, 2012, Commissioner Helen Kim, an appointee of Controller Wendy Gruell, proposed an alternative map of CD 10 that would have kept intact the entirety of Koreatown, as defined by the WCKNC Boundaries.

61.  The West/South Ad Hoc Committee voted both on the Ellison Map and the alternative map presented by Commissioner Kim.  Both maps received three (3) votes in favor (out of seven (7) votes total).  As a result, because both maps received same number of votes, the West/South Ad Hoc Committee agreed to submit both maps to a larger "Dispute Resolution" subcommittee tasked with resolving disputes between proponents of conflicting maps.

62.  But the Ellison Map was the only map of CD 10 considered by the Dispute Resolution subcommittee, and therefore was the only map of CD 10 provided to the full Commission.  The Ellison Map was also the only map of CD 10 that was presented to the public for comment.  Upon information and belief, Commissioner Ellison and other proponents of the Ellison Map intentionally suppressed the alternative map presented by Commissioner Kim.

## The Redistricting Commission Ignores Numerous Alternative Plans That Would Keep the WCKNC Boundaries Whole in a Single District

63.   Following the completion of the work of the Ad Hoc Committees, the combined maps of the three Ad Hoc Committees were presented to the public (the "Initial Commission Map"). Between February 1 and February 11, 2012, the Redistricting Commission held another series of public hearings at which Los Angeles residents were given an opportunity to comment on the proposed maps. As before, the Redistricting Commission did not engage in line-drawing at the public hearings.

64.   During and before these hearings, various constituents presented to the Redistricting Commission alternative maps to the Initial Commission Map that kept the WCKNC Boundaries whole. These included a Proposed Los Angeles Citywide Plan, submitted by the Asian Pacific American Legal Center ("APALC") to the Redistricting Commission on January 18, 2012, which kept the WCKNC Boundaries whole in CD 13. In addition, Grace Yoo, executive director of the Korean American Coalition ("KAC"), presented a map at a public hearing on February 9, 2012, which kept the WCKNC Boundaries whole in CD 13. These maps are attached hereto as Exhibits A and B, respectively.

65.   Unlike the map reflecting the CD 10 boundaries drawn by Commissioner Ellison, neither the map presented by APALC nor the map presented by Ms. Yoo of KAC was ever presented or voted on at any meeting of the Redistricting Commission.

66.   At a meeting of the Redistricting Commission on January 25, 2012, Commissioner Helen Kim presented a proposed map that would have placed the entirety of the WCKNC Boundaries whole in CD 13. Commissioner Kim's map is attached hereto as Exhibit C. The Redistricting Commission rejected this map, and instead extended a portion of the northern boundary of Koreatown just a few streets northward to Beverly Boulevard. This still resulted in the exclusion of 30% of the population of Koreatown from CD 10.

## In Approving the Ellison Map, the City and the Redistricting Commission Ignores the Unanimous Voices of the Koreatown Community and Residents of CD 8, as Well as Traditional Redistricting Criteria

67.   Hundreds of Koreatown residents again came to each of the February 2012 public hearings to speak in favor of keeping the WCKNC Boundaries whole in a single District.  The Redistricting Commission's hearings drew an unprecedented turnout from the Korean-American community; over 99% of the speakers asked for Koreatown to be kept whole in a single District.  Additionally, thousands of Korean Americans testified or submitted letters and 3,056 petitions were submitted to the Redistricting Commission asking that the WCKNC Boundaries be kept whole in CD 13.

68.   The number and unanimity of Los Angeles residents, both within and outside of Koreatown, speaking at each of the public hearings in favor of including the WCKNC Boundaries whole in a single District caught the attention of the Los Angeles area media.  The concerns of Koreatown residents became the subject of significant media coverage, much more so than the concerns of any other community, due to the substantial public outcry on the issue.

69.   But the Redistricting Commission ignored the almost unanimous requests from Koreatown residents – as well as residents of Los Angeles outside Koreatown – to keep the WCKNC Boundaries whole in a single District, and did not consider the public input on this issue in its subsequent meetings.

70.   The Redistricting Commission also ignored the residents of historically and predominantly African-American neighborhoods in CD 8, including residents of Leimart Park and Baldwin Hills, who testified at the February 2012 hearings that they wanted their communities to remain undivided in CD 8.

71.   The Redistricting Commission also ignored numerous traditional redistricting criteria in drawing CD 10.  The Redistricting Commission exempted CD 10 from its own stated desire to keep neighborhoods and communities intact.  It created a district that was not contiguous and compact; more than one media commentator

referred to the district's appearance as that of a "fat turkey."  And it severely underpopulated CD 8; in a single swoop CD 8 went from one of the most populous districts in Los Angeles to one of the least populous districts.

72.  In drawing CD 10's boundaries to increase the percentage of its African-American voters, the City also contradicted CD 10's own history as a cross-racial coalition district.  CD 10 has a special record of producing candidates that have bridged political alliances among a variety of communities.  For example, Los Angeles' first African American mayor, Tom Bradley, represented this council district before seeking city wide office, due largely to his ability to forge relationships across racial lines. Much of the election history in CD 10 is due to the fact that this district has maintained a balance among the various ethnic and racial populations that live in these neighborhoods.  Over the last four decades, no single racial group has controlled more than 40% of the voting age population.  Consequently, a winning political candidate typically runs by appealing for votes in more than a single racial community.

73.  On February 22, 2012, the Redistricting Commission approved the Final Commission Map and forwarded that map to the City Council for approval.  During that same meeting, Commissioner David Roberti acknowledged that Koreatown "lost" in the Final Commission Map – not a surprising admission, given that the Redistricting Commission ignored the almost unanimous input from the WCKNC community to respect the WCKNC Boundaries.

74.  According to statistics released by the Redistricting Commission, the Final Commission Map increased the African-American percentage of the Citizen Voting Age Population ("CVAP") in CD 10 from 36.8% to 43.1%, and increased the percentage of African-American registered voters in CD 10 from 43.2% to 50.6%.  The Final Commission Map made the Korean-American community in CD 10 a captive minority, with an Asian voter registration of 9.2%.

## Approval by City Council

75.  On March 14, 2012, Gerry F. Miller, the City's Chief Legislative Analyst, issued a report recommending certain revisions to the Final Commission Map.  With respect to CD 10, those changes were largely inconsequential.  The City approved and ratified the Redistricting Commission's decision to split Koreatown, to move most of the Palms neighborhood out of CD 10, and to move several historic and majority African-American neighborhoods in Baldwin Hills and Leimart Park into CD 10.

76.  On March 17, 2012, the City Council adopted the Final Commission Map, as amended, by a vote of 13-2, and instructed the City Engineer to translate the pictorial map into a word version, called the "metes and bounds," that would constitute the Redistricting Ordinance to be finally passed by the City Council.

77.  However, the City Council did not vote on the final Redistricting Ordinance until June 13, 2012, almost three months later.  Upon information and belief, the City Council intentionally delayed the development of the metes and bounds and the vote on the Redistricting Ordinance in order to reduce the likelihood that Plaintiffs, and other parties aggrieved by the Constitutional and statutory violations resulting from the Redistricting Ordinance, would be able to obtain timely judicial relief before the next City Council elections.

78.  The City Council's initial vote on the Redistricting Ordinance was not unanimous.  As a result, the City Council was required to hold an additional vote on the Redistricting Ordinance one week later.  On June 20, 2012, the City Council voted 13-2 to adopt the Redistricting Ordinance.

79.  The Redistricting Ordinance was subsequently signed by Mayor Villaraigosa on June 22, 2012 and published on July 2, 2012.

# FIRST CAUSE OF ACTION

## (Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Pursuant to 42 U.S.C. § 1983)

80.  Paragraphs 1 through 79, inclusive, of this Complaint are re-averredand incorporated by reference.

81.  Plaintiffs are entitled to the equal protection of law under the Fourteenth Amendment of the United States Constitution.

82.  The Redistricting Ordinance discriminates on the basis of race against Plaintiffs and all other voters who own businesses or reside in WCKNC in one or more of the ways set forth below, each of which is sufficient to demonstrate race-based discrimination used to include or exclude voters from CD 10:

    (a)    Defendant City redrew district lines predominantly based on racial data, for the illegitimate purpose of packing African-American voters into CD 10 to achieve an artificially high percentage of African-American registered voters in CD 10;

    (b)    Defendant City's use of race as the predominant line-drawing criterion subordinated traditional districting principles and conflicts with documented population shifts in the relevant area of Los Angeles, as evidenced by (among other things) the data from the 2010 Census;

    (c)    Defendant City placed African-American voters into CD 10 based predominantly on the unconstitutional racial stereotype that African-American voters, solely because of their race, will vote as a racial bloc for an African-American incumbent;

    (d)    The boundaries of CD 10 can only be explained based on the use of racial criteria, as evidenced by the irregular shape of the District, which ignores traditional redistricting principles including contiguity and compactness, keeping communities of interest intact, following the requests of the community's residents, avoiding overpopulation or

underpopulation of districts, and CD 10's own history as a cross-racial coalition District;

(e)     Defendant City discriminated against Plaintiffs and all of the residents and business-owners of Koreatown by including or excluding these voters from CD 10 based on their race, which prevented them from obtaining a City Council representative who best represents the shared socio-economic, cultural, linguistic, public health, and other common interests of the Koreatown community; and

(f)     In other ways as will be proven during the trial of this matter.

83.   Defendant City ignored and/or rejected several alternative maps proposed by Commissioner Kim, APALC and KAC, among others, that would have better satisfied the legitimate political goals of the Redistricting Commission as well as traditional nonracial districting principles, including keeping neighborhoods and communities of interest intact.  Instead, Defendant considered and adopted a map that drew District lines predominantly on the basis of race, thereby ignoring or subordinating traditional, non-racial redistricting principles and legitimate political goals.

84.   Defendant City's use of race in drawing CD 10 is not strictly necessary to serve a compelling governmental purpose.

85.   Defendant City has offered no adequate justification for discriminating on the basis of race for the purpose of drawing CD 10.

86.   Defendant City's use of race is not the least restrictive means available to give the residents of WCKNC an opportunity to participate equally in the political process.

87.   Plaintiffs and all residents and/or owners of businesses located in WCKNC were denied equal protection under the law and injured by the City, and its agents, when the City used race-based discrimination to draw CD 10 without a compelling governmental purpose or where less restrictive means are available.

88.  For all of these reasons, the Redistricting Ordinance violates the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

89.  Plaintiffs have no adequate remedy at law other than the judicial relief sought here.  The failure to temporarily and permanently enjoin enforcement of the Redistricting Ordinance will irreparably harm Plaintiffs by violating their Constitutional and statutory rights.

90.  To remedy these Equal Protection violations in a timely manner, the Court should appoint a Special Master to oversee the process of redrawing district lines pursuant to fair and legal criteria.

91.  In the interests of justice, the Court should order the Special Master to implement redistricting criteria including population equality and preservation of communities and neighborhoods of interest, including the Neighborhood Council boundaries.

92.  Upon presentation of an appropriate independent redistricting plan by the Special Master, the Court should adopt that plan and order elections to proceed in 2013 using those Districts.

## SECOND CAUSE OF ACTION

### (Violation of Section 204 of the City Charter)

93.  Paragraphs 1 through 79, inclusive, and paragraphs 81 through 93, inclusive, of this Complaint are re-averred and incorporated by reference.

94.  Section 204 of the City Charter mandates that "All [City Council] districts **shall** be drawn in conformance with requirements of state and federal law and, to the extent feasible, **shall** keep neighborhoods and communities intact, utilize natural boundaries or street lines, and be geographically compact."

95.  As demonstrated in maps submitted by Commissioner Helen Kim, APALC, and KAC, among others, it was and is feasible to keep the WCKNC Boundaries whole within a single District.

96.  By failing to keep the WCKNC Boundaries whole within a single District, the Redistricting Ordinance failed to keep neighborhoods and communities intact even though it was feasible.

97.  Furthermore, the Redistricting Ordinance violates the United States Constitution.

98.  Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of the Redistricting Ordinance will irreparably harm Plaintiffs by violating their constitutional and statutory rights.

## THIRD CAUSE OF ACTION

### (Violation of California Constitution Article 2, Section 11(a))

99.  Paragraphs 1 through 79, inclusive, paragraphs 81 through 93, inclusive, and paragraphs 94 through 98, inclusive, of this Complaint are re-averred and incorporated by reference.

100. Los Angeles City Charter Section 460 provides that "[a]ny ordinance adopted by the Council, except an ordinance taking effect upon its publication or passage as provided in Section 252, is subject to a referendary petition as set forth in this Article."

101. Los Angeles City Charter Section 252 lists ordinances "which shall take effect upon their publication: . . . (h) an ordinance establishing Council or Board of Education districts . . . ." Through its City Charter, Defendant has prohibited Plaintiffs from exercising their right to a referendum.

102. California Constitution Article 2, Section 11(a) states that initiatives and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide.

103. Each of Plaintiffs is prepared and willing to file a petition for a referendum to overturn the Redistricting Ordinance.  By prohibiting Plaintiffs from pursuing such a referendum, the City Charter violates the California Constitution.

104. Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin enforcement of the Redistricting Ordinance will irreparably harm Plaintiffs by violating their constitutional and statutory rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment and relief as follows:

1.   That the Court temporarily enjoin Defendant City from calling, holding, supervising, or certifying any elections under the Redistricting Ordinance;

2.   That the Court issue a declaratory judgment that the Redistricting Ordinance is unconstitutional and illegal for one or more of the reasons set forth above;

3.   That the Court permanently enjoin Defendant City from calling, holding, supervising, or certifying any elections under the Redistricting Ordinance;

4.   That the Court appoint a Special Master to oversee the redrawing of the District boundaries, taking into account population equality and preservation of communities and neighborhoods of interest, including the Neighborhood Council boundaries;

5.   That, upon the Special Master's completion of a proposal to redraw the District boundaries, the Court issue an order or judgment adopting the Special Master's proposal;

6.   That the Court issue a declaratory judgment that those portions of Sections 460 and 252 of the Los Angeles City Charter that prohibit Plaintiffs from petitioning for and carrying out a referendum to overturn the Redistricting Ordinance are unconstitutional;

7.   That the Court Order the City to hold a referendum on the Redistricting Ordinance;

8.   That the Court award Plaintiffs the costs of this action together with their reasonable attorneys' fees, pursuant to 42 U.S.C. Section 1988; and

9.      All other damages and relief, equitable or otherwise, including, but not limited to attorneys' fees, as the Court may deem just and proper.

Dated:  July 31, 2012                 **AKIN GUMP STRAUSS HAUER & FELD LLP**


By _John Karaczynski / DM for_
    John A. Karaczynski
    Attorneys for Plaintiffs
    PETER LEE, MIRI PARK, HO SAM
    PARK, GENEY KIM, AND YONAH
    HONG

Dated:  July 31, 2012                 **BIRD MARELLA BOXER WOLPERT NESSIM DROOKS & LINCENBERG P.C.**


By _Ekwan Rhow / DM for_
    Ekwan E. Rhow
    Attorneys for Plaintiffs
    PETER LEE, MIRI PARK, HO SAM
    PARK, GENEY KIM, AND YONAH
    HONG

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all causes of action that are triable by jury.

Dated:  July 31, 2012

AKIN GUMP STRAUSS HAUER & FELD LLP

By _____
John A. Karaczynski
Attorneys for Plaintiffs
PETER LEE, MIRI PARK, HO SAM PARK, GENEY KIM, AND YONAH HONG

Dated:  July 31, 2012

BIRD MARELLA BOXER WOLPERT NESSIM DROOKS & LINCENBERG P.C.

By _____
Ekwan E. Rhow
Attorneys for Plaintiffs
PETER LEE, MIRI PARK, HO SAM PARK, GENEY KIM, AND YONAH HONG

COMPLAINT