1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

11
12   PETER LEE, et al.,

13   and                                      ) CASE NO. CV 12-06618 CBM (RZx)
                                              )
14   STANLEY HAVERILAND, et al.,              ) RELATED CASE NO. CV 13-01410
                                              )
15                    Plaintiffs,             )
                                              ) ORDER GRANTING
16                                            ) DEFENDANT'S MOTIONS FOR
         vs.                                  ) SUMMARY JUDGMENT;
17                                            ) DENYING PLAINTIFFS' MOTION
     CITY OF LOS ANGELES,                     ) FOR SUMMARY ADJUDICATION
18                                            )
19                    Defendant.

20

21        Plaintiffs Peter Lee, Miri Park, Ho Sam Park, Yonah Hong, and Geney Kim
22   (the "Lee Plaintiffs") are registered voters and residents of "Koreatown," in the
23   city of Los Angeles, California.  The Lee Plaintiffs reside within the boundaries of
24   Los Angeles City Council District ("CD") 10.  Plaintiffs Stanley Haveriland,
25   Theordore Thomas, Horace Pennman, Julia Simmons, Heather Presha, and Sally
26   Stein (the "Haveriland Plaintiffs") are registered voters in the city of Los Angeles
27   residing in Los Angeles City Council Districts ("CDs") 9, 8, and 10.  Following
28

1

the 2012 Los Angeles redistricting process, the Lee Plaintiffs and Haveriland Plaintiffs (collectively "Plaintiffs") filed separate lawsuits against the City of Los Angeles (the "City" or "Defendant").  The Lee Plaintiffs' complaint focused on the City's failure to put "Koreatown" in one City Council District, while the Haveriland Plaintiffs' complaint focused on the City's move of two predominantly African-American neighborhoods from CD 8 into CD 10 and the creation of a majority Latino district in CD 9.  Both sets of Plaintiffs brought claims alleging that the City violated: (1) the Equal Protection Clause of the Fourteenth Amendment, (2) Section 204 of the City Charter, and (3) the Article II, Section 11(a) of the California Constitution.  The Lee and Haveriland Plaintiffs' lawsuits were consolidated for all purposes on the parties' stipulation.  (Docket No. 33.)

Following two years of litigation, the City now moves for summary judgment on all of Plaintiffs' claims.  (Docket Nos. 84, 87.)  The Plaintiffs move for summary adjudication as to their third cause of action (the California Constitutional law claim).  (Docket No. 106.)   The Court finds that there is no triable issue of material fact that the City violated the Fourteenth Amendment in the 2012 redistricting process.  Having so found, the Court grants judgment in favor of the City as to Plaintiffs' first cause of action, Plaintiffs' only federal claim, and dismisses Plaintiffs' supplemental state law causes of action (claims two and three) without prejudice.  The City of Los Angeles' Motions for Summary Judgment are GRANTED as to Plaintiffs' first cause of action.  (Docket Nos. 84, 87.)  Plaintiffs' Motion for Summary Adjudication as to Plaintiffs' Third Cause of Action is DENIED.  (Docket No. 106.)

## I.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

## II.   FACTUAL OVERVIEW

Los Angeles redraws its political boundaries after each decennial census to account for population and demographic shifts over the previous ten years. Pursuant to a City Charter provision that was approved by the voters of Los Angeles in 1999, Los Angeles redistricting begins with the selection of a twenty-one-member volunteer Redistricting Commission.  Los Angeles Charter & Admin. Code ("Charter") § 204.  This Redistricting Commission is responsible for "seek[ing] public input throughout the redistricting process" and advising the City Council (the "Council") on the drawing of Council District lines.  *Id*.  The Commission is required to present a non-binding proposal for redistricting to the Council in March of redistricting years.  Charter § 204(c).  The City Council must adopt a redistricting ordinance by July 1 of redistricting years.  *Id.*

Following the 2010 census, the second Los Angeles Redistricting Commission was appointed (the first was appointed after the 2000 census).  The mayor appointed three members, the City Controller and the City Attorney each appointed one member, the City Council President appointed three members, and each City Councilperson appointed a member to the Redistricting Commission (the "Commission").

### 1.  The Redistricting Commission

The Commission first met in September 2011 and began reviewing copies of the existing 2002 Council District map (the "Benchmark Map").  Due to growth and shifts in the City's population, the CDs in the Benchmark Map had developed a population deviation of over 19%, indicating that changes were necessary to comply with the electoral principle of equal legislative representation.[1]  Also,

---

[1] Under the principle of "one person, one vote," established by *Baker v. Carr*, 369 U.S. 186 (1962), total population deviation is the difference between the most under-populated district and the most over-populated district. The *Baker* Court held that each individual must be weighted equally (or as equally as possible) in legislative apportionment.  *Id.*  Under the City's guidelines, population deviation should not be greater than 10%, and the Commission adopted a resolution that the population deviation should not be greater than 5%.  (Defense RJN, Ex. A at 30 and Exs. M, N.)

1   several Neighborhood Councils were certified after 2002, and the 2012

2   Commission considered the boundaries of ninety-five Neighborhood Councils.[2]

3   (*See* Defense RJN, Ex. A at 30-31.) The Benchmark Map divided fifty-three of

4   these ninety-five Neighborhood Councils across more than one council district,

5   and divided thirteen Neighborhood Councils (including the Wilshire-Center

6   Koreatown Neighborhood Counsel or "WCKNC") among three CDs.  (*See*

7   Defense RJN, Ex. A at 30-31, 36-37.)  The Benchmark Map also split several

8   communities defined by the City's official community renaming policy process,

9   including Koreatown.[3] (*See id.* at 36.)

10        The Commission adopted a "Summary of Legal Criteria that Governs the

11   Redistricting Process" and this document was posted and available at Commission

12   meetings and provided an outline of the legal criteria the Commission was

13   responsible for complying with.  (*See* Defense RJN, Ex. K (Docket No. 102).)

14   This Summary of Legal Criteria was often referred to by Commission members

15   and staff, and provided guidance applicable to complying with the equal

16   protection clause and the City Charter.  (Decl. of Andrew J. Westall in Supp. of

17   Def. City of Los Angeles' Mot. for Summ. J. ("Westall Decl.") ¶ 18.)

### a.  Public Input and Fact Gathering Hearings

19        From December 5, 2011 through January 10, 2012, the Commission held a

---

[2] Los Angeles Neighborhood Councils are groups of people who have certified a boundary within Los Angeles pursuant to Los Angeles Ordinance 176704, thereby establishing a unique recognized community within the City. Neighborhood Councils are smaller than Council Districts, but are recognized political subdivisions with defined geographic boundaries that share political interests.  (*See* Los Angeles Charter and Admin. Code, Art. IX; *see also* Defense RJN Exs. C, D.)

[3] Evidence demonstrates that several different boundaries defining Koreatown were reviewed by the Commission, including the Olympic Division LAPD boundaries and the Koreatown boundaries as  identified by the L.A. Times L.A. Communities project. (Defense RJN, Ex. A, p. 36.)  For this lawsuit, Plaintiffs use the term "Koreatown" to describe the Wilshire-Center Koreatown Neighborhood Council, the largest Neighborhood Council in the City of Los Angeles by more than 10,000 people with a population of 95,324 residents (52.4% Latino; 35.4% Asian).  *Id.* Koreatown, as defined by the Los Angeles community renaming policy in 2010, has a population of 53,155 residents (46.9% Latino; 40.0% Asian).  (*Id.*; *see also* City Council's January 31, 2006 Motion Approving City's Official Community Renaming Policy, Defense RJN, Ex. E.)

series of public hearings throughout Los Angeles, with at least one hearing held in each of the fifteen City Council districts. (Decl. of Bobbi Jean Anderson in Opp'n to Def.'s Mot. for Summ. J. ("Anderson Decl.") ¶ 7 (Docket No. 132-17); Decl. of Helen Kim in Opp'n to Def.'s Mot. for Summ. J. ("Helen Kim Decl.") ¶ 9 (Docket No. 136).)  The Commission created a website and posted public notices about how to get involved with the redistricting process and information about the ongoing process.  These notices were posted in several languages throughout the city.  The Commission's website made meeting agendas, podcasts of all public hearings, and maps proposed by the public and interest groups publicly available. At each of the public hearings, the public was provided an opportunity to comment and express their concerns and desires for Los Angeles redistricting.  In addition, the City broadcasted Commission meetings live on local television, streamed them online, and later posted the recorded video of meetings on the Commission's website.  More than 1,800 individuals attended the public hearings and the Commission received more than 500 public or written comments. (Westall Decl. ¶ 24.)

### b. Drafting the Initial Redistricting Map

On January 11, 2012, the Commission began drafting an initial district map. As was done in the 2002 round of redistricting, the Commission divided into three "ad hoc" groups for the initial line-drawing process. The ad hoc groups were responsible for drawing the boundary lines for:  (1) the San Fernando Valley (Council Districts 2, 3, 6, 7, and 12); (2) the West and Southwest ("West Group") (Council Districts 4, 5, 8, 10, and 11) and (3) the South and East ("East Group") (Council Districts 1, 9, 13, 14, and 15).  Each ad hoc group consisted of seven Commissioners.  The Technical Director (the individual in charge of using the line-drawing software) was the only non-Commission member present in the ad hoc group meetings.  To comply with the California Brown Act, the

1  Commissioners were instructed not to discuss ad hoc group discussions with
2  Commissioners in other ad hoc groups.[4]

3      Prior to the ad hoc groups meeting on their own, on January 18, 2012, the
4  full Commission convened in its regular session and considered twenty-one
5  proposed Map Presentations by individuals and groups.  (Westall Decl. ¶¶ 26-27;
6  Defense RJN, Ex. A at 37-44.)  Maps proposed by the Korean American
7  Coalition, the Asian Pacific American Legal Center, the Historic South Central
8  NAACP, and other groups and individuals were all considered by the
9  Commission.  (*See* Westall Decl. ¶ 26, Defense RJN, Ex. A at 37; Defense RJN
10 Ex. H at 1055.)   These plans were posted on the Commission's website and kept
11 in the Commission's office in City Hall.  (*Id.*)

12     The West Group (the ad hoc group that was responsible for providing the
13 initial proposal for the districts challenged in this lawsuit) held its first line-
14 drawing meeting on January 19, 2012. (Helen Kim Decl. ¶ 30.)  Members of the
15 West group included Christopher Ellison, Helen Kim, Bobbie Jean Anderson,
16 Julie Downey, Rob Kadota, Grover McKean, and David Roberti.[5]  The
17 West/South Ad Hoc Committee was responsible for drawing the boundary lines of
18 five City Council districts: CDs 4, 5, 8, 10, and 11.

19     The West Group was tasked with incorporating additional population into
20 CD 10, because it had become underpopulated (the district was about 4.9% below
21 the ideal district population size).  (Expert Report of Kareem U. Crayton
22 ("Crayton Rept.") at 6 (Docket No. 132-6).)  In this initial West Group meeting,
23 Commissioner Ellison, who was appointed by the Councilmember for CD 10
24 (Council President Wesson), suggested changing the Benchmark Map by

[4] The Brown Act is contained in section 54950 et seq. of the California Government Code and prohibits any non-public gathering of a quorum of a legislative body to discuss or transact business under the body's jurisdiction.  The ad hoc groups, because they represented less than a quorum and could not make final decisions, were permitted to meet without a public meeting under the Brown Act.

[5] Commissioners Kim, Anderson, and Roberti offered declarations in support of Plaintiffs' Opposition to Defendants' summary judgment motions.  (*See* Docket Nos. 132-17, 136, 142-1.)

6

incorporating Leimert Park and the "Dons" portion of Baldwin Hills into CD 10. (Helen Kim Decl. ¶ 39.)  Commissioner Ellison also suggested excluding the Palms neighborhood from CD 10, and adding a portion of the WCKNC into CD 10.  (Helen Kim Decl. ¶ 40.)  Some members of the West Group (including key declarants in this lawsuit) disagreed with the proposed boundaries of CD 10 because the change resulted in a shift of the African-American population from CD 8 (Los Angeles' only majority African-American district) to CD 10 (a district with a sizeable African-Americans population), and because these changes incorporated half, but not all, of the WCKNC in CD 10.  (*See, e.g.*, Helen Kim Decl.)  Some of the West Group Commissioners believed that Commissioner Ellison intended to increase the level of African-American registered voters in CD 10 to over 50% and did not support Commissioner Ellison's suggested changes to CD 10.  (*Id.*; *see also* Roberti Decl. ¶ 16.)  Over the objection of a minority of the West Group members, changes suggested by Commissioner Ellison were included in the West Group map forwarded to the full Commission to be considered at the first public hearing.

### c.  Public Hearings and First Draft of Redistricting Map

On January 25, 2012, the Chair of the Commission, Andrew Westall, presented the "Initial Commission Map," which combined the maps generated by each of the ad hoc committees, at a public hearing.  Many of the Commissioners were present, including Commissioners Kim, Ellison, Anderson, Kodota, and Roberti of the West Group.  During this hearing, Commissioner Kim (who had opposed Commissioner Ellison's changes to CD 10) presented a proposed map that would have placed the entirety of the WCKNC in CD 13.  (Helen Kim Decl. ¶ 60.)  Commissioner Kim's proposed map (similar to the West Group's map) incorporated Liemert Park and Baldwin Hills into CD 10 and increased the African-American citizen voting age population ("CVAP") in that district to

1    41.2% from the Benchmark Map's 36.8%.[6]  (*See* Helen Kim Decl., Ex. J at 10.)

2    Commissioner Kim moved that her proposed alternative map be adopted by the

3    Commission.  (*Id*.)  The Commission rejected Commissioner Kim's map by a vote

4    of 12-3.  (*See id.*; *see also* Defense RJN Ex. H, at 1057.)

5          The Commission took public comments, debated the Initial Commission

6    Map for over three hours, and eventually approved the release of the first draft for

7    additional public comment and review ("First Draft Map").  (Defense RJN, Ex. H

8    at 1057-58; Westall Decl. ¶ 32.)

9          In the following weeks, the Commission proceeded to hold public hearings

10   throughout the City to receive further public input on the First Draft Map.  (*See*

11   Westall Decl. ¶ 33.)  Commissioners and an average of 400 members of the public

12   attended each meeting.  (*Id*.)

### d.  Second Draft of Redistricting Map

14         After the second round of public hearings, the Commission revised the First

15   Draft Map at an open public meeting on February 15, 2012.  (Defense RJN, Ex. S

16   at 1204 (Docket No. 103.)  The Commission discussed and voted on more than

17   eighty adjustments to the First Draft Map that were proposed by the public, and

18   approved forty-two of the proposed adjustments.  (Defense RJN, Ex. H at 1060-

19   70, Ex. M at 1112 (Docket No. 103.))  Many of the proposed amendments

20   revolved around keeping Neighborhood Councils and other communities

21   undivided within one Council District.  One of the approved adjustments was to

22   keep the "Empowerment Congress West Area Neighborhood Development

23   Council, which includes all of Leimert Park and Baldwin Hills, whole in CD 10."

24   (Defense RJN, Ex. H. at 1062, Ex. M (Docket No. 102 at 1113.))  The

25   Commission also approved a motion that the Council would "keep at least two-

26   thirds (64) of the Neighborhood Councils whole in a Council District…"

---

[6] Commissioner Kim's proposed map would have increased the African-American population in CD 10 to a CVAP of 40.5%.

(Defense RJN, Ex. H at 1061.)  The Commission denied a motion to "move the southern portion of Wilshire Center Koreatown Neighborhood Council into CD 13 in order to unify the Wilshire Center Koreatown Neighborhood Council whole in one Council District" by a vote of 17-4.  (*Id.* at 1066.)  This public hearing lasted eight hours.  (Westall Decl. ¶ 35.)  Following the hearing, the Commission completed and released the "Second Draft Map" for the public to review and propose additional changes.  (*Id.* ¶ 36.)

### e.  Final Commission Map

A final public Redistricting Commission hearing was held on February 22, 2012.  At this hearing, the Commission considered fourteen additional amendments proposed by the public and approved five of these amendments. (Defense RJN at 24 & Ex. T. (Docket No. 104 at 1218); Ex. H, p. 1071 (Docket No. 102).)  Thereafter, the Commission approved a final recommended plan (the "Final Commission Map") by a vote of 16-5.  (RJN at 24 & Ex. T; SUF, ¶ 21; Westall Decl., ¶ 36; Defense RJN Ex. H, p. 1073 (Docket No. 102).) (attached hereto as Appendix A).



Case 2:12-cv-06618-CBM-JCG   Document 114   Filed 06/30/14   Page 3 of 9   Page ID #:3158

2012 City Council District Map

**City of Los Angeles Council Districts**

**Appendix A**

Ex. AA
1380

Eric Garcetti
Mayor

The City Attorney's Office reviewed the Final Commission Map and concluded that it satisfied all relevant legal criteria.  (Defense RJN, Ex. A, App. C; Westall Decl. ¶ 44.)  The Commission then drafted a comprehensive report that set forth the Commission's activities, considerations, and the public's input in

creating Final Commission Map.  (*See* Defense RJN at 36-44.)  The report was 951 pages, with appendices.  (Defense RJN at 15-965.)  The report documented the "Major Issues" the Commission considered, such as redistricting the boundaries of Koreatown/WCKNC, South Los Angeles, Downtown Los Angeles, Westchester, and the Foothill communities.  (*Id*. at 32-33 (Docket No. 96); Defense RJN Ex. A, p. 36-44.)

## 2.  Los Angeles City Council & Finalizing the 2012 CD Map

The Chair and Co-Chairs of the Commission presented the Final Commission Map and report to the City Council's Rules, Elections and Intergovernmental Relations Committee (the "Rules Committee") at a public meeting on March 2, 2012.  (Wickham Decl. ¶ 7; Defense RJN, Ex. U.)  The Rules Committee subsequently held public hearings on March 5, 6, and 7, at three separate locations throughout the City.  (*Id*.)  The Rules Committee permitted any City Councilmember to propose amendments to the Final Commission Map. (Wickham Decl. ¶ 8.)  Councilmembers submitted twenty-five proposed amendments.  (*Id.*)  The Chief Legislative Analyst's Office ("CLA") reviewed those proposals and issued a lengthy public report discussing each of the proposed amendments and recommending that eighteen of those amendments be adopted to modify the Final Commission Map.  These changes to the Final Commission Map were approved by the Council, and the changes were incorporated into a Final Map.  (*Id.*; Defense RJN, Exs. V & W.)

On March 16, 2012, at a public meeting, the City Council approved, by a vote of 13-2, the Final Map, the 2012 Redistricting Ordinance. (Wickham Decl. ¶ 12; *see also* Defense RJN, Ex. X.)  The Mayor signed the 2012 Redistricting Ordinance and it became effective upon publication.

## 3.  The Present Controversy

On July 31, 2012, the Lee Plaintiffs filed a lawsuit against the City

challenging the City's 2012 redistricting results and process.  The Plaintiffs alleged that the City violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution by racially gerrymandering CD 9 and CD 10 (referred to herein as Plaintiffs' "*Shaw* claim").  The Plaintiffs also alleged that the City violated Section 204 of the Los Angeles City Charter by failing to keep communities and neighborhoods (specifically the WCKNC) "intact" to "the extent feasible."  Finally, Plaintiffs' third cause of action alleged that the City violated Article II, Section 11(a) of the California Constitution by denying Plaintiffs the right to a referendum on the 2012 Redistricting Ordinance.

## III.  STATEMENT OF LAW

On a motion for summary judgment, the Court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *Simo v. Union of Needletrades, Indus. & Textile Empls.*, 322 F.3d 602, 609-10 (9th Cir. 2003); Fed. R. Civ. P. 56.  Summary judgment against a party is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.  The moving party bears the initial burden of establishing the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

## IV.   ANALYSIS

### 1.  Plaintiffs' First Cause of Action: Equal Protection *Shaw* Claim

Equal Protection jurisprudence instructs that the government may not classify citizens by race unless such a classification can meet the strict scrutiny of the court.  *Fisher v. U. of Texas at Austin*, 758 F.3d 633, 642 (5th Cir. 2014).  The Supreme Court has found that, in "exceptional" circumstances, facially race-neutral redistricting schemes may be viewed as racial classifications (or unlawful racial gerrymanders) subject to strict scrutiny.  *Shaw v. Reno*, 509 U.S. 630, 646-47 (1993) ("*Shaw*" or "*Shaw I*").  To succeed on an Equal Protection claim and prove a racial classification under *Shaw*, plaintiffs must meet "the demanding burden of proof to show that a facially neutral law is unexplainable on grounds other than race." *Easley v. Cromartie*, 532 U.S. 234, 235 (2001) ("*Cromartie II*"). A *Shaw* violation may exist when "race is the predominant consideration in drawing the district lines such that the legislature subordinates traditional race-neutral principles to racial considerations."  *Shaw v. Hunt*, 517 U.S. 899, 907 *("Shaw II*") (internal quotations omitted).   Courts use restraint in finding that facially-neutral redistricting ordinances objectionable "[b]ecause the underlying districting decision falls within a legislature's sphere of competence." *Cromartie II*, 532 U.S. at 235.  "[C]ourts must exercise extraordinary caution in adjudicating [*Shaw*] claims," *Miller v. Johnson,* 515 U.S. 900, 916 (1995), and a "presumption of good faith…must be accorded [to] legislative enactments." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) ("*Cromartie I*").

As an initial matter, only individuals who live in a district challenged on equal protection grounds have standing to bring a *Shaw* claim.  *See United States v. Hays*, 515 U.S. 737, 739 (1995) (holding that plaintiffs lack standing where they "do not live in the district that is the primary focus of their racial gerrymandering claim, and they have not otherwise demonstrated that they, personally, have been

13

subjected to a racial classification.")  Accordingly, the Lee Plaintiffs and two of the Haveriland Plaintiffs (Presha and Stein) have standing to challenge CD 10. Only Plantiff Pennman has standing to challenge CD 9.  Three of the Haveriland Plaintiffs, Haveriland, Simmons, and Thomas, residents of CD 8, do not have standing to bring a *Shaw* claim challenging CD 9 or CD 10.  *Id.*

Plaintiffs assert that both CD 10 and CD 9 (as adopted by the 2012 Redistricting Ordinance) violate the Equal Protection Clause as unconstitutional racial gerrymanders.[7]  Defendants move for summary judgment and argue that the 2012 Redistricting Ordinance is a race-neutral statute and that Plaintiffs cannot provide evidence that CD 9 or CD 10 were drawn based on race.  To defeat summary judgment on their *Shaw* claim, Plaintiffs must "raise a genuine issue of material fact regarding whether the legislature abandoned or subordinated traditional redistricting principals to racial considerations." *Cano v. Davis*, 211 F. Supp. 2d 1208, 1219, 1458 (C.D. Cal. 2002) (Reinhardt, J., Snyder, J., and Morrow, J.) *aff'd*, 537 U.S. 1100 (2003) ("*Cano II*"); *see also Shaw II*, 517 U.S. at 907.  Plaintiffs must provide evidence that the "facially neutral law is unexplainable on grounds other than race."  *Shaw I*, 509 U. S. at 644.  Considering all of Plaintiffs' evidence in the light most favorable to their case, the Court finds that there is no evidence that CD 9 or CD 10 racially classify the Plaintiffs. Accordingly, there is no evidence that CD 9 and CD 10 violate the Equal Protection clause.  *See Shaw I*, 509 U.S. 630, 643 (holding that strict scrutiny only applies "to those 'rare' statutes that, although race neutral, are, on their face,

---

[7] The Haveriland Plaintiffs also argue, "race is being used as a primary factor in redrawing district lines which is a violation of the Voting Rights Act."  (Haveriland Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment at 10:17-18.)  The use of race as a "primary factor" in drawing district lines is not a violation of the Voting Rights Act.  Further, Plaintiffs do not bring a Voting Rights claim in this lawsuit.  Conversely, Section 2 of the Voting Rights Act is a civil rights statute that requires consideration of race (or other communities of interest) in redistricting, and may require, in some instances, that race be a primary factor in redistricting.  *See, e.g. League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 402 (2006) ("Under [Voting Rights Act] § 2, by contrast [to the Equal Protection Clause], the injury is vote dilution, so the compactness inquiry considers 'the compactness of the minority population, not ... the compactness of the contested district.'")

1   'unexplainable on grounds other than race.'") (internal citation omitted)).

2   ### a.  The Shape of the Challenged City Council Districts

3      Although bizarre shape is not required to establish a *Shaw* claim, the

4   irregular shape of a district significantly influences the outcome of *Shaw* cases.

5   *Shaw I*, 509 U.S. at 647 ("[R]eapportionment is one area in which appearances do

6   matter").  Indeed, the "bizarre" shape of North Carolina's twelfth congressional

7   district, which was drawn with the intent of creating a majority African-American

8   district to meet the preclearance requirements of Section 5 of the Voting Rights

9   Act,[8] first established that an equal protection claim could be made in the

10  redistricting context.  *Id.*  Furthermore, extremely unusually-shaped districts—

11  likened to spider webs and tentacles by the Supreme Court—were central to the

12  analysis in the only three Supreme Court cases in which *Shaw* claims were

13  successful.  *See Shaw I,* 517 U.S. 899, *Miler v. Johnson*, 515 U.S. 900 (1995), and

14  *Bush v. Vera*, 517 U.S. 952 (1996).   North Carolina's twelfth congressional

15  district, was a "snakelike" district 160 miles long but often no wider than the I-85

16  corridor, which "gobble[d] in…enclaves of black neighborhoods."  *Shaw I*, 509

17  U.S. at 635.  Similarly, Georgia's eleventh congressional district, the district at

18  issue in *Miller v. Johnson*, was a "monstrosity" containing "narrow land bridges"

19  that traveled hundreds of miles through rural areas to connect urban "appendages

20  containing nearly 80% of the district's total black population." *Miller*, 515 U.S. at

21  909, 917 (citations omitted).  Further, the three Texas congressional districts at

22  issue in *Bush v. Vera* contained "bizarrely shaped tentacles" that reached for and

23  connected pockets of minority populations to create minority-majority districts.

24  *Bush*, 517 U.S. at 965, 973.  There is no precedent in which a court has found a

25  *Shaw* violation in the absence of the court finding that the challenged district was

26  irregular in shape.

27

28  _____

[8] Section 5 of the Voting Rights Act is not at issue in this case.

Conversely, the map established by the 2012 Redistricting Ordinance demonstrates that CD 10 is one of the most compact districts in Los Angeles.  (*See* Appendix A.)  CD 10 is contiguous and its contours generally follow the boundaries of Los Angeles Neighborhood Councils and geographic markers.  Plaintiffs argue that CD 10 is unusual in shape based on a media commentator's reference to the district's appearance as that of a "fat turkey."  (Defense RJN, Exs. AA at 1390; Plaintiffs' RJN at Exs. D-G.)  A media commentator did so comment; however a commentator's rhetorical flourish is not evidence.  Furthermore, a "fat turkey" is a relatively compact and contiguous shape.

The 2012 Redistricting Ordinance similarly demonstrates that CD 9 is compact and contiguous.  (*See* Appendix A.)  The shape of the challenged districts is "highly probative" in showing that CDs 9 and 10 were *not* drawn primarily on the basis of race.  *Cano*, 211 F. Supp. 2d at 1222, n.15.

### b.  The Demographics of the Challenged City Council Districts

*Shaw* claims seek to avoid political districts that would "balkanize us into competing racial factions" or generate "political apartheid" by creating districts that represented specific racial groups or racial coalitions to the detriment of others.  *Shaw I*, 509 U.S. at 657, 647.  The Supreme Court has never applied *Shaw* principles to invalidate a district in which the allegedly favored minority population does not represent a controlling electoral majority.  The Plaintiffs in this case, therefore, ask this Court to do something that has never been done by the Supreme Court.  *Shaw* jurisprudence prohibits municipalities from intentionally and artificially creating districts defined by a race (such as "Black districts" or "White districts") because the Supreme Court finds such districts to be unfair racial classifications of the citizens within those districts.  Here, Plaintiffs challenge two racially diverse districts.  In CD 10, which Plaintiffs claim favors African-Americans, no one racial group has a controlling majority population.   In

1  CD 9, which the Haveriland Plaintiffs challenge as favoring Latinos, the Latino

2  population is only slightly higher than 50%.  The demographics of CD 9 and CD

3  10 do not support Plaintiffs' claim that the City caused Plaintiffs any

4  representational harm or engaged in the "unlawful segregation of races of citizens

5  into different voting districts," which are the harms *Shaw* claims aim to address.

6  *Id*. at 645 (internal quotation omitted).

7       The slight demographic changes from the Benchmark Map to the 2012

8  Redistricting Ordinance are evidence weighing against finding that CD 9 or CD 10

9  are unlawful racial gerrymanders.  African-Americans comprise only 25.9% of the

10  population in CD 10.  (Wickham Decl., Ex. G at 27.)  The City's 2012

11  Redistricting Ordinance increased CD 10's African-American population by only

12  1.7% from the demographics under the 2002 Council District map.  (*Id.*)  CD 10's

13  voting population ("Citizen Voting-Age Population" or "CVAP") was 36.8%

14  African-American in 2002, and under the 2012 Redistricting Ordinance this

15  percentage increased to 40.5%.  (*Id.*)  The CVAP change in African-American

16  population in CD 10 was only 3.7%.  (*Id.*)  Unlike every other district challenged

17  in binding *Shaw* precedent, CD 10 is a multiracial district where no one racial

18  group constitutes a majority.

19       Similarly, the demographics of CD 9 do not provide evidence of improper

20  racial gerrymandering under *Shaw*.  Under the 2012 Redistricting Ordinance, CD

21  9's CVAP is 52.2%, Latino, 8.5% White, 33.0% African-American, and 4.8%

22  Asian.  (Defense Ex. C (Docket No. 85-3).)   None of these populations changed

23  more than 4% from the 2002 Benchmark Map.  Plaintiffs argue that the City

24  purposefully created a majority-Latino district.  However, even if the City did

25  purposefully create a majority-Latino district, this would not constitute an equal

26  protection violation.  Law encourages purposeful creation of majority-minority

27  districts where minority populations are geographically compact.  In some

28

instances, cities are required to deliberately draw majority-minority districts by Section 2 of the Voting Rights Act of 1965.[9]  *See Thornburg v. Gingles*, 478 U.S. 30 (1986); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 403 (2006); *Old Pers. v. Cooney*, 230 F.3d 1113, 1128 (9th Cir. 2000).

"There is no evidence that the legislature sought to ensure that voters of any particular race would dominate either district."  *Cano*, 211 F. Supp. 2d at 1218.  The uncontested evidence tends to support that neither CD 9 nor CD 10 served to unlawfully classify the Plaintiffs by a particular race.

### c. Evidence of Race Consciousness

#### (i)  Plaintiffs' Purported "Direct Evidence" of Intent

Plaintiffs' core argument as to why the City's motion for summary judgment should be denied is that there is "direct evidence" of racial intent.  This evidence is twofold.  First, the evidence demonstrates that Commissioner Christopher Ellison (one of the twenty-one Commissioners, none of whom had voting power to pass the 2012 Redistricting Ordinance) voiced the goal of increasing the African-American population in CD 10. (Declaration of Leo James Terrell ("Terrell Decl.") Ex. 5 (Docket No. 126-2); Helen Kim Decl., Ex. F.).  Second, the evidence demonstrates that the City Council President, Herb Wesson, Jr. (one of thirteen Councilmembers who voted to approve the 2012 Redistricting Ordinance), praised the increased African-American population in CD 10 after the redistricting ordinance was passed.  (Terrell Decl., Ex. 4.)  Plaintiffs' also argue there is there is "direct evidence" that a Commissioner opposed an amendment to the western boundary of CD 9 because it would dilute the Latino population.  Plaintiffs' evidence regarding individual legislators' motivations is insufficient to create a factual dispute sufficient to overcome summary judgment on a *Shaw* claim.  *See Cano*, 211 F. Supp. 2d at 1228 ("[T]he mere use of race as *a* reason for

---

[9] The Plaintiffs brought no Voting Rights claims against the City in this case.

a redistricting decision cannot lead to a *Shaw* violation [on summary judgment]…"); s*ee also Cromartie II*, 532 U.S. at 253.

The Supreme Court's analysis in *Cromartie II* is instructive as to why Plaintiffs' argument that evidence of racial motivation alone is sufficient to prove a *Shaw* violation fails.  In *Cromartie II*, the plaintiffs produced, and the district court relied on, two pieces of "direct" evidence of discriminatory intent to prove that North Carolina's redistricting process was predominantly motivated by race and thus a *Shaw* violation. 532 U.S. at 253.  First, plaintiffs relied on evidence of a statement by a state senator and leader of the redistricting effort, testifying publicly before a legislative committee, in which he stated that the redistricting plan "satisfies a need for racial and partisan balance." *Id.*  The district court pointed to the state senator's reference of "racial balance" as an admission that the legislature had drawn the districts using race as a controlling factor. *Id*  The Supreme Court, however, found that "even as so read, the phrase shows that the legislature considered race, along with other partisan and geographic considerations; and as so read it says little or nothing about whether race played a predominant role comparatively speaking." *Id.* at 253-54 (citing *Bush v. Vera*, 517 U.S. at 952, 958 (O'Connor, J., principal opinion)).  The plaintiffs in *Cromartie II* also offered evidence of an email sent from a legislative staff member to two state senators discussing moving portions of the African-American community into and out of certain districts. *Id.* at 254.  The district court found that this evidence proved racial intent and a *Shaw* violation. *Id*.  The Supreme Court, however, reversed the district court and entered judgment in favor of the legislature, concluding that, as a *matter of law,* the plaintiffs' "evidence taken together . . . does not show that racial considerations predominated in the drawing of District 12's boundaries." *Id.* at 257.

The evidence offered by Plaintiff demonstrates only that some individuals

involved in the redistricting process (namely Commissioner Ellison and Council President Wesson) may have been motivated by racial considerations.  The evidence also supports that some of the changes to CD 10 for which Commissioner Ellison advocated became a part of the 2012 Redistricting Ordinance.  This evidence does not permit a fact finder to draw an inference "that racial considerations predominated in the City's drawing of [d]istrict … boundaries." *Id.* at 257.  Plaintiffs provide no evidence that the advisory Commission was motivated to create a "Black district" in CD 10 or a "Latino district" in CD 9.  The evidence conversely demonstrates that Commissioners did not agree on the drawing of the district lines.  Furthermore, there is no evidence that the City Council, the legislative body that passed the 2012 Redistricting Ordinance, was motivated by race in drawing the boundaries of CD 9 and CD 10.  Plaintiffs' evidence that one Commissioner expressed racial concerns and one Councilmember praised the Redistrict Ordinance after it was passed cannot be imputed to prove the City's motivation.

Furthermore, evidence that race was "*a* motivation for the drawing of a majority-minority district" is not evidence that supports a *Shaw* claim.  *Bush v. Vera,* 517 U.S. at 959.  Even if Plaintiffs were able to provide evidence of the City's racial motivation, which the Court finds they fail to do, such evidence would be insufficient to prove an equal protection violation.  A *Shaw* claim has not been proven as a matter of law even where a legislative body uses "facially race-driven" criteria in creating an electoral district; there must be evidence that race is the *predominant* or *only* motivating factor.  *See Cromartie I*, 526 U.S. at 545, 552.  Considering all of Plaintiffs' "direct evidence" in the light most favorable to Plaintiffs does not create a material dispute that the City was predominately motivated by race in redistricting CD 9 or CD 10.

**(ii)    Plaintiffs' Purported "Circumstantial Evidence" of Intent**

Plaintiffs argue that they provide "circumstantial evidence" which may prove that race was the predominant motivating factor in the City's changes to CD 10.[10]  This evidence includes (1) A boundary segment analysis generated by Professor Kareem Crayton; (2) a statistical analysis comparing the African-American and white population changes made to CD 10; and (3) "procedural irregularities."  Considering Plaintiffs' "circumstantial evidence," and viewing it in the light most favorable to the Plaintiffs, does not create a material issue of fact that the City was predominantly motivated by race in establishing CD 10.  Plaintiffs' evidence demonstrates that there were demographic changes to CD 10 resulting in greater African-American population and a reduced white population in CD 10.  Plaintiffs' evidence also demonstrates that some Commissioners felt that the Redistricting Commission procedures were unfair.  This evidence does not support Plaintiffs' *Shaw* claim.

The City does not dispute that race was a factor considered in its drawing of CD 9 and CD 10.  In fact, the law requires that the City consider communities of interest (racial or otherwise) in redistricting.  *See League of United Latin Am. Citizens*, 548 U.S. at 402.  Race consciousness "does not give rise to a claim of racial gerrymandering when race is considered along with traditional redistricting principles, such as compactness, contiguity, and political boundaries." *DeWitt v. Wilson*, 856 F. Supp. 1409, 1413 (E.D. Cal. 1995); *see also Cano*, 211 F. Supp. 2d at 1220; *see also Alabama Legislative Black Caucus v. Alabama*, (*ALBC*) 989 F. Supp. 2d 1277, 1294 (M.D. Ala. 2013), *cert. granted* (finding that "[a]lthough race was a factor in the creation of the districts, we find that the Legislature did not subordinate traditional, race-neutral districting principles to race-based considerations").  The Court finds that there is no evidence that the City was

---

[10] Plaintiffs do not offer any additional evidence pertaining to CD 9.

1   predominantly motivated by race.  Furthermore, the consideration of the City's

2   motivation is only half of the relevant *Shaw* inquiry.

3                **d.  No Subordination of Traditional Redistricting Criteria**

4          Neglecting or subordinating traditional districting criteria is a necessary

5   element of a *Shaw* claim.  *Bush*, 517 U.S. at 962.  With its motions for summary

6   judgment, the City provides undisputed evidence that every change to CD 10 and

7   CD 9 worked in favor of fulfilling a traditional non-racial redistricting purpose.

8   Plaintiffs fail to provide any evidence that the City subordinated traditional

9   redistricting criteria to racial considerations in drawing the district lines for CD 9

10  or CD 10.

11         The City provides evidence that every change to the Benchmark Map of CD

12  10 satisfied a traditional, non-racial, redistricting purpose.  Comparing the

13  Benchmark Map boundaries with the 2012 Redistricting Ordinance, the evidence

14  demonstrates that there were twelve changes made to CD 10 after the 2010 census.

15  (Westall Decl., Ex. B at 55.)  Defendants' Exhibits C and D to their Motion for

16  Summary Judgment as to the Lee Plaintiffs provide undisputed evidence that each

17  change made to CD 10 furthered some traditional non-racial redistricting criteria

18  (most commonly, keeping neighborhood councils intact).  (Docket No. 88-3, 88-

19  4.)  The evidence provided by Defendants is uncontested and tends to prove that

20  the changes made to CD 10 promoted traditional redistricting criteria by unifying

21  neighborhoods councils.  The City's removal of the Palms neighborhood from CD

22  10 resulted in a reduction in the white population of CD 10; however, this change

23  also unified the Palms Neighborhood Council into one district, ameliorating the

24  Palms Neighborhood Council's three-district split under the 2002 Benchmark

25  Map.  Similarly, the incorporation of Leimert Park and Baldwin Hills into CD 10

26  helped to unify a neighborhood council (the Empowerment Congress West Area

27  Neighborhood Council).  The Final Commission Map, which Plaintiffs argue was

28

1   motivated by race based on Commissioner Ellison's comments, unified the

2   neighborhood of Baldwin Hills in CD 10.  The evidence shows that the City

3   Council, however, removed the heavily African-American "Dons" section of the

4   Baldwin Hills neighborhood from CD 10 and placed it into CD 8 because the

5   incumbent Councilmember for CD 8 resided in the "Dons" neighborhood.

6          The biggest change made to CD 10 from the Benchmark Map, and the

7   change that appears of most concern to the Plaintiffs, was the City's addition of a

8   large portion of the WCKNC into CD 10.  The Plaintiffs argue that the WCKNC

9   should not have been divided amongst Council Districts.  Evidence demonstrates

10  that, despite the public's strong advocacy asking the City to keep WCKNC whole

11  in one Los Angeles city council district (CD 13), the City did not do so. While the

12  City failed to meet this Neighborhood Council's demands, the changes made to

13  CD 10 advanced the goal of unifying the WCKNC and other Neighborhood

14  Councils.  Incorporating a large portion of WCKNC into CD 10 resulted in the

15  WCKNC being divided only between two council districts, whereas under the

16  Benchmark Map this Neighborhood Council was divided amongst three council

17  districts.[11]  Furthermore, the 2012 Redistricting Ordinance consolidated two-thirds

18  of the WCKNC into one district (CD 10) and placed the City's officially named

19  "Koreatown," undivided, in one council district.  The evidence presented to this

20  Court, therefore, demonstrates that the City's changes to CD 10 were consistent

21  with traditional redistricting principles.

22          Defendants also provide evidence proving that the four changes made to CD

23

24  _____

25  [11] It is notable that this change to CD 10 reduced the percentage of the African-American population in CD 10, because the WCKNC incorporated a population with a relatively low percentage of African-Americans.  (Cain Decl. ¶ 43; *see also* Wickham Decl., Ex. C.)  The WCKNC population consisted of 5.5% African-American population, and 10.4% African-American CVAP.  (*Id.*)  The evidence, therefore, creates an inference that tends to disprove Plaintiffs' argument that the City was predominantly motivated by increasing the African-American population in CD 10.  Furthermore, the district map proposed by Commissioner Kim at the Commission's January 15, 2015 meeting, which sought to place the WCKNC entirely in CD 13, would have resulted in a higher African-American population in CD 10 (41.2%) than resulted from the 2012 Redistricting Ordinance (40.5%). (*See* Cain Decl. ¶ 43; *Compare* Helen Kim Decl., Ex. J at 464-65 *with* Defense Ex. F.)

9 served non-racial traditional redistricting purposes.  (*See* Defendants' Motion for Summary Judgment as to Haveriland Plaintiffs' Claims, Ex. A.)  Plaintiffs do not dispute Defendants' evidence.  While the Plaintiffs argue that the City moved Downtown Los Angeles from CD 9 into CD 14 artificially, there is no evidence to support the argument that the move was artificial.  The evidence demonstrates that the City's changes from the Benchmark Map to the 2012 Redistricting Ordinance consolidated Downtown Los Angeles into CD 14 and unified the Downtown Neighborhood Council. (Westall Decl. ¶¶ 50-51 & Ex. B; Cain Decl., ¶ 36 & Ex. G.)  Plaintiffs do not present any evidence challenging that the City's changes to CD 9 promoted traditional redistricting principles.

Regardless of the motivation behind the City's creation of CD 9 and CD 10, the evidence that the City did not subordinate or neglect traditional redistricting criteria in passing the 2012 Redistricting Ordinance is undisputed.  Summary judgment must, therefore, be granted in favor of the City.  *See Cromartie I*, 526 U.S. at 541 ("To carry their burden, [plaintiffs] were obliged to show—using direct or circumstantial evidence, or a combination of both… that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.").

## 2.  Plaintiffs' State Law Causes of Action

The Plaintiffs assert two additional state law causes of action, one under the City Charter and one under the State Constitution.  As the Court grants summary judgment in favor of the City on Plaintiffs' *Shaw* claims, the Court has discretion to dismiss these supplemental state law claims.  28 U.S.C. § 1367(c)(3); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").  The City moves for this Court to exercise its discretion and dismiss the Plaintiffs' state

law claims.

It is unclear whether this Court has jurisdiction over Plaintiffs' state law claims, as supplemental jurisdiction exists only "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367.  Neither party raised or addressed the issue of whether the Court has supplemental jurisdiction.  If the Plaintiffs' state law claims do not stem from the same "case or controversy" as Plaintiffs' *Shaw* claim, this Court does not have jurisdiction.  Plaintiffs' only federal cause of action claims that the City drew the lines of CD 9 and CD 10 predominantly motivated by the goal of increasing the African-American population in CD 10 and the Latino population in CD 9, thereby engaging in racial gerrymandering and classifying the Plaintiffs by race in violation of equal protection principles.  Plaintiffs' federal claim, therefore, has attenuated, if any, ties to Plaintiffs' second claim, which argues that the City failed to keep the boundaries of the WCKNC whole within a single district in violation of the Los Angeles City Charter.[12]  It is even more unclear whether Plaintiffs' federal claim has any relation to Plaintiffs' third cause of action, which alleges that the Los Angeles City Charter infringes Plaintiffs' rights to a referendum under the California Constitution.

Assuming that this Court has supplemental jurisdiction, however, the Court finds that it should exercise its discretion to dismiss Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c).   The discovery in this matter targeted only Plaintiffs' federal law claim, and "economy, convenience and fairness to the parties, and comity" are all served by dismissing Plaintiffs' state-law claims to be considered by a state court.  *See Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th

---

[12] It is also unclear to this Court whether Plaintiffs' second cause of action states a claim upon which any legal relief may be granted.

Cir. 2003).  Plaintiffs' state law claims present novel and unique state-law issues, with wholly dissimilar factual considerations than the federal cause of action, which served as the heart of this case.  Maintaining federal jurisdiction of Plaintiffs second and third causes of action presents an entirely different lawsuit before this Court, with separate facts, laws, and issues unrelated to the claim that provided this Court with original jurisdiction.  *See Gibbs*, 383 U.S. 727 ("Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.").  Plaintiffs' second and third causes of action are dismissed without prejudice.  Plaintiffs may seek relief in state court.

## V.    CONCLUSION

The Court GRANTS Defendant's Motions for Summary Judgment, and enters judgment in favor of the City as to Plaintiffs' first cause of action.  (Docket Nos. 84, 87.)  The Court dismisses Plaintiffs second and third causes of action. The Court DENIES Plaintiffs' Motion for Summary Adjudication.  (Docket. No. 106.)

**IT IS SO ORDERED.**

DATED: 24 February 2015

_____

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE