**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PETER LEE, individual; MIRI PARK, individual; HO SAM PARK, individual; GENEY KIM, individual; YONAH HONG, individual, *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF LOS ANGELES, *Defendant-Appellee.* | No. 15-55478 <br><br> D.C. No. 2:12-cv-06618-CBM-JCG |
| STANLEY HAVERILAND, individual; THEODORE THOMAS, individual; HORACE PENNMAN, individual; JULIA SIMMONS, individual; HEATHER PRESHA, individual; SALLY STEIN, individual, *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF LOS ANGELES, *Defendant-Appellee.* | No. 15-55502 <br><br> D.C. No. 2:12-cv-06618-CBM-JCG <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted January 9, 2017
Pasadena, California

Filed November 19, 2018

Before:  Jacqueline H. Nguyen* and Paul J. Watford,
Circuit Judges, and Mark W. Bennett,** District Judge.

Opinion by Judge Nguyen

**SUMMARY***

**Civil Rights**

The panel affirmed the district court's protective order and its order granting summary judgment in favor of the City of Los Angeles in an action alleging that the City was motivated predominantly by racial considerations in drawing the boundaries of its current Council Districts for its 2012 redistricting ordinance.

---

* Judge Nguyen was drawn to replace Judge Reinhardt on the panel following his death. Judge Nguyen has read the briefs, reviewed the record, and listened to the oral argument.

** The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa, sitting by designation.

*** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that, although the evidence showed that race was a motivation in drawing Council District 10, plaintiffs failed to raise a genuine issue of material fact as to whether race was the predominant factor motivating the legislature's decision as to the Council Districts' final boundaries. The panel held that even viewed in the light most favorable to plaintiffs, the record failed to show that the successive boundary amendments were driven predominantly by racial considerations. Instead, the panel held that the City Council Redistricting Commission's final report and recommendations showed that, overall, the Commission sought to rebalance the populations in each Council District, while preserving communities and unifying as many Neighborhood Councils as possible in a single Council District. The panel further held that the circumstantial evidence, demographic data and expert analyses failed to create a genuine dispute on racial predominance in Council District 10.

The panel agreed with the district court that legislative privilege protected local officials from being deposed and questioned regarding any legislative acts, motivations, or deliberations pertaining to the 2012 redistricting ordinance. The panel held that the factual record in this case fell short of justifying such a "substantial intrusion" into the legislative process.

**COUNSEL**

Rex S. Heinke (argued), John A. Karaczynski, Hyongsoon Kim, and Patrick E. Murray, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California; Ekwan E. Rhow, Bird Marella Boxer Wolpert Nessim Drooks Lincenberg & Rhow

P.C.; for Plaintiffs-Appellants Peter Lee, Miri Park, Ho Sam Park, Geney Kim, and Yonah Hong.

Leo James Terrell, Law Offices of Leo James Terrell, Los Angeles, California, for Plaintiffs-Appellants Stanley Haveriland, Theodore Thomas, Horace Pennman, Julia Simmons, Heather Presha, and Sally Stein.

Robin B. Johansen (argued) and Thomas A. Willis, Remcho Johansen & Purcell LLP, Oakland, California; Harit U. Trivedi, Deputy City Attorney; Valerie L. Flores, Managing Assistant City Attorney; Michael N. Feuer, City Attorney; Office of the City Attorney, Los Angeles, California; for Defendant-Appellee.

## OPINION

NGUYEN, Circuit Judge:

At least once every ten years, the City of Los Angeles (the "City") must redraw the boundaries of its Council Districts in accordance with the requirements of its City Charter. Unsurprisingly, this decennial exercise can ignite intense debate and political maneuvering. These debates often center around "communities of interest," which are frequently but not exclusively defined along racial or ethnic lines, and which the City must take into account in its redistricting. In Los Angeles, certain communities have been divided across two or more Council Districts for decades even when they have been historically concentrated in certain areas of the City. Here, for example, Koreatown in Los Angeles is the largest Korean community in the United States, but, because it has been split into multiple

City Council districts, the community has encountered
"difficulty getting elected officials to address [its] needs."

Even as the redistricting process endeavors to respect the
integrity of these communities of interest, the City has
recognized that it is "inevitable . . . that some interests will
be advanced more than others by the choice of a particular
district configuration."    The City Council (and the
Commission charged with advising it) must make these
tough calls, recognizing that not all communities will be
satisfied with the outcome.   While the City Council may
consider the passionate advocacy of these local
communities, they must ultimately adhere to the strictures of
the United States and California Constitutions and the City
Charter.  Thus, the City Council generally may not act with
race as a predominant motivating factor.  *Cooper v. Harris*,
137 S. Ct. 1455, 1463 (2017).   Doing so would be
presumptively unlawful under the Equal Protection Clause
of the Fourteenth Amendment, unless the City can meet the
demanding burden of showing that such action was narrowly
tailored to serve a compelling interest.  *Id.* at 1464.

In this appeal, we must decide whether Plaintiffs have
presented sufficient evidence to survive summary judgment
on the claim that the City was motivated predominantly by
racial considerations in drawing its current Council Districts.
That is, we consider whether the City primarily sought to
maximize the voting power of certain racial groups over
others when drawing Council Districts and subordinated all
other considerations to that priority.  On this record, we
conclude that Plaintiffs have failed to raise a genuine issue
of material fact on whether racial considerations
predominated the City's redistricting process.  We further
agree with the district court that legislative privilege protects
local officials from being deposed.  We therefore affirm the

district court's protective order and its order granting summary judgment in favor of the City.

# I. Background

## A. Factual Background

The Los Angeles City Council Redistricting Commission was created after Los Angeles voters adopted the current Los Angeles City Charter in 1999. The purpose of the Commission is to advise the Los Angeles City Council on the drawing of new Council District (alternatively, "CD") boundaries. These boundaries are drawn every ten years after each federal census with the goal of ensuring that each Council District contain "as nearly as practicable, equal portions of the total population of the City" as shown in the most recent census data. To the extent feasible, the boundaries are to be drawn to "keep neighborhoods and communities intact, utilize natural boundaries or street lines, and be geographically compact." In accordance with the City Charter, a Commission was appointed to propose new boundaries after the 2010 census. Since the previous redistricting in 2002, changes in population had caused imbalances across Council Districts that required rebalancing.

### 1. *The Commission's Initial Steps*

The Commission began the redistricting process by holding several preliminary meetings between September 27, 2011 and December 5, 2011. At these initial meetings, the Commission was presented with the existing Council District boundaries along with population and demographic data from the 2010 Census. The Commission then held a series of public hearings throughout the City between December 5, 2011, and January 10, 2012. One of the issues

raised at these hearings was whether the Wilshire Center-Koreatown Neighborhood Council ("Koreatown") should continue to be split across multiple Council Districts or united into a single Council District. At the time, Koreatown fell within at least three Council Districts: CDs 4, 10, and 13. The majority of public participants at the hearings spoke in favor of joining Koreatown into a single Council District.

On January 11, 2012, the Commission held a meeting at which the Chair of the Commission proposed dividing the Commission into three ad hoc committees corresponding to three regions: (1) the San Fernando Valley; (2) West and Southwest Los Angeles; and (3) East and Southeast Los Angeles. Each committee would meet on its own and be responsible for drawing an initial map of the Council Districts within its assigned region. The Commission voted to approve this proposal.

### 2. *The Ad Hoc Committees Draw the Initial Council District Boundaries*

The committee assigned to West and Southwest Los Angeles (the "West/Southwest Committee") was responsible for drawing five Council Districts, including CD 10. CD 10 is west of downtown Los Angeles and split in half by the I-10 (Santa Monica Freeway). At the time of the 2012 redistricting, the 2010 Census data indicated that CD 10 was about 4.9% below its required population size. Its registered voters were 49.1% African American, and its Citizen Voting Age Population ("CVAP") percentages were 36.8% African American, 28.2% Latino, 17.1% Asian, and 15.9% White.

At the West/Southwest Committee's first meeting, Commissioner Chris Ellison, who had been appointed to the Commission by City Council President Herb Wesson (CD

8                    LEE v. CITY OF LOS ANGELES

10's councilmember), prepared his proposed boundaries for
CD 10. These boundaries encompassed majority African
American neighborhoods that had previously been in CD 8,
such as Leimert Park and the "Dons" portion of Baldwin
Hills. They also excluded from CD 10 a substantial portion
of the "Palms" neighborhood (which had a minority of
African American residents) and split Koreatown's
population between CD 10 and CD 13. In presenting his
proposed boundaries, Ellison stated that he sought to
increase the percentage of registered African American
voters in CD 10 to over 50%. He later reiterated this
intention in an email:

> Being a historical African American
> opportunity district, we found it necessary to
> increase the AA population. We attempted to
> protect the historical African American
> incumbents in this district by increasing the
> black voter registration percentage and
> CVAP #s accordingly. As you can discern on
> the attachment, we were able to increase the
> numbers to 50.12% and 42.8%, respectively.
> This was a significant increase in black voters
> in CD 10 which would protect and assist in
> keeping CD 10 a predominantly African-
> American opportunity district.

He continued:

> We agreed to move the western portion of CD
> 10 (Palms) into CD 5 and 11. This area is
> approximately 50% white voter registration
> or CVAP, 20% Latino CVAP and
> approximately 11% AA voter registration.
> This move would allow CD 10 to divest itself

of this diverse populated area, and increase
the AA population to the South.

After Ellison's presentation, other Commissioners
proposed alternative boundaries. Ellison's proposed
boundaries and the boundaries proposed by Commissioner
Helen B. Kim received the most votes from the
West/Southwest Committee with three votes each, but
neither received a majority. Because both Ellison's and
Kim's proposals received the same number of votes, the
West/Southwest Committee should have submitted both
proposals to a larger "Dispute Resolution" subcommittee to
"stitch[] together" a compromise from the various proposals.
However, this did not occur, and instead only Ellison's
proposal was presented to the Dispute Resolution
subcommittee.[1] As a result, the West/Southwest Committee
ultimately presented only Ellison's proposal to the full
Commission for approval.

### 3. *The Commission Considers the Proposed Boundaries*

Although the West/Southwest Committee formally
presented Ellison's proposal to the Commission,
Commissioner Kim presented an alternative set of
boundaries to the Commission that would have placed
Koreatown entirely within CD 13. The Commission rejected

---

[1] The record does not provide a clear explanation as to why Ellison's
map, but not Kim's map, moved forward: whether it was a result of
"suppression," or, alternatively, a misunderstanding by the initial
Valley/West Dispute Resolution Committee that the Kim map had "not
gone through the proper process." In any case, the record indicates that
once the first Dispute Resolution Committee had met to resolve
boundaries for the Valley/West region, those boundaries were effectively
"locked in" for the subsequent East/West Dispute Resolution
Committee.

Kim's proposal. Because it was the largest neighborhood in Los Angeles, the Commission did not find it practical or feasible to maintain Koreatown within a single Council District without creating "major disruptions to other communities and Council Districts throughout the City." Instead, the Commission incorporated Ellison's proposal into a complete draft Council District map, which it released for public comment and review.

After considering the public feedback, the Commission debated and approved 42 out of 80 proposed adjustments. The Commission then placed these amended boundaries before the public for another round of comment and review.[2] This led to yet another round of amendments wherein the Commission approved 5 of 14 proposed adjustments. The Commission then approved this "final" set of boundaries on a 16–5 vote, which was forwarded to the City Council with additional adjustments for the City Council to consider.

The Commission's final proposal increased the African American CVAP in CD 10 from 36.8% to 43.1%, and it increased the percentage of African American registered voters in CD 10 from 43.2% to 50.6%. The White CVAP in CD 10 decreased from 15.6% to 11.1%, and the Asian CVAP decreased from 17.1% to 16.3%.

### 4. *The City Council Deliberates and Promulgates the Final Council District Boundaries*

After the City Council received the Commission's final proposal, it held three public hearings throughout the City to

---

[2] Over the course of this entire process, the Commission held a total of 22 public testimony hearings and 10 business meetings, which over 5,000 people attended and which produced over 6,500 pieces of written and verbal testimony.

further review and revise it.  Based on these hearings, City Council members ended up proposing 25 additional adjustments to the Commission's proposed boundaries.  The City's Chief Legislative Analyst reviewed these proposed changes along with the Commission's original proposal and recommended adopting the Commission's proposed boundaries with 18 of the 25 proposed adjustments.  According to the Legislative Analyst, adoption of these 18 adjustments would resolve concerns raised during the public hearings.

On March 16, 2012, the City Council adopted the Commission's proposal with the 18 additional adjustments. On June 20, 2012, the City Council passed the final redistricting ordinance, which was signed and published two days later.  CD 10's final boundaries increased African American CVAP from 36.8% to 40.5%, and decreased White CVAP from 15.9% to 12.3% and Asian CVAP from 17.1% to 16.3%.

Afterwards, Council President Wesson made the following statements to the Baptist Ministers' Conference in July 2012:

> One, it has been since November, so brothers and sisters, it was me against twelve other members on the Council.  I had no backup.  I had no faction.  And I did the very best I could with what I had.  And I was able to protect the most important asset that we as black people have.  And that's to make sure that a minimum of two of the council peoples will be black for the next thirty years.
>
> We as African Americans make up only 9% of the population.  9%.  If we didn't all live

> clustered together, we would not have one
> council district. Not one. The Asians have
> 16% of the population. They don't have one
> district. Why? Because they live all over. So
> it's important for us to harness our resources
> because the most important asset again that
> we have as people is to make sure we have a
> black vote or two on that council. And that
> was my priority.

## B. Procedural History

On July 31, 2012, Peter Lee, Miri Park, Ho Sam Park, Geney Kim, and Yonah Hong filed a complaint in federal district court alleging that the City violated the U.S. and California Constitutions and the City Charter in drawing CD 10. On February 26, 2013, Stanley Haveriland, Theodore Thomas, Horace Pennman, Julia Simons, Heather Presha, and Sally Stein filed a similar complaint in federal district court bringing the same claims against the City for CD 10, but also challenging the boundaries for CDs 8 and 9. The district court consolidated these cases on August 21, 2013.

In the course of litigation, the City moved for a protective order prohibiting Plaintiffs from questioning City officials regarding any legislative acts, motivations, or deliberations pertaining to the 2012 redistricting ordinance. The City also sought to specifically prohibit Plaintiffs from deposing Mayor Eric Garcetti, Council President Wesson, City Councilmember Jose Huizar, and former City Councilmember Jan Perry. The district court granted the City's motion and issued a protective order.

On February 24, 2015, the district court granted summary judgment in favor of the City as to Plaintiffs' federal constitutional claim and declined to exercise

supplemental jurisdiction over their remaining claims, which it dismissed without prejudice. Plaintiffs appeal both the summary judgment order and the issuance of the protective order.[3]

## II. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's order granting summary judgment. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). "Summary judgment . . . is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) (*Cromartie I*).

We generally review protective orders entered under a district court's inherent authority for abuse of discretion. *Wharton v. Calderon*, 127 F.3d 1201, 1205 (9th Cir. 1997). However, "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). Because the application of a legal privilege is "essentially a legal matter" that is reviewed de novo, *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007), we apply that standard here to the district court's application of the legislative privilege.

---

[3] Because we do not rely on it in this opinion, we **DENY** the City's motion requesting judicial notice as moot.

### III. Discussion

### A. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "Its central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (*Shaw I*). This includes "separating . . . citizens into different voting districts on the basis of race" without "sufficient justification." *Cooper*, 137 S. Ct. at 1463 (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797 (2017)). Claims that voting districts have been drawn on race-based lines are evaluated under a two-step analysis: (1) the plaintiffs must first prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district"; and (2) if the plaintiffs do so, the burden shifts to the defendant "to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 1463–64 (quoting *Bethune-Hill*, 137 S. Ct. at 797). The district court granted summary judgment after finding that the plaintiffs failed to raise a genuine dispute at the first step of the analysis.

Proving that race was the predominant factor in drawing district boundaries "entails demonstrating that the legislature 'subordinated' other factors . . . to 'racial considerations.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). What matters is "the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the [legislative body] in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. at 799. Plaintiffs may

make this showing with direct or circumstantial evidence. *Cooper*, 137 S. Ct. at 1464.

In proving that race was the predominant factor, it is unnecessary to show an actual conflict between the enacted plan and "traditional redistricting principles." *Bethune-Hill*, 137 S. Ct. at 799. "Race may predominate even when a reapportionment plan respects traditional principles," *id.* at 798—for example, when a legislative body uses race as the predominant criterion to advance those principles, *see Cooper*, 137 S. Ct. at 1464 n.1. Given that traditional redistricting principles are "numerous and malleable," a legislative body "could construct a plethora of potential maps that look consistent with traditional, race-neutral principles." *Bethune-Hill*, 137 S. Ct. at 799. "But if race for its own sake is the overriding reason for choosing one map over others, race still may predominate." *Id.* Still, the Supreme Court has recently reiterated that the "good faith of [the legislative body] must be presumed," and the burden of proof rests with the challenger to demonstrate that race predominated the districting process. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (quoting *Miller*, 515 U.S. at 915).

Plaintiffs argue that race was in fact the overriding motivation behind CD 10's boundaries. They contend that Council President Wesson used his powerful and prominent position to ensure that CD 10 would become a majority African American Council District. Wesson claimed credit for acting to preserve African American seats on the City Council after the redistricting process concluded. He explicitly stated that it had been his "priority" to "make sure we have a black vote or two on that council."

In light of Wesson's statements, Plaintiffs draw particular significance from two facts: (1) Wesson's

appointment of Christopher Ellison, a man with no prior redistricting experience, to the Redistricting Commission, and (2) the division of the Commission into ad hoc committees for the initial drawing of Council District boundaries. According to Plaintiffs, the explicit purpose of the ad hoc committees was to avoid public scrutiny, and Ellison was appointed specifically to pursue Wesson's race-based agenda. Outside public view, and with fewer Commissioners against whom he needed to contend, Ellison could exercise greater control over the proceedings and more effectively pursue his (and Wesson's) goals. Indeed, Plaintiffs assert that "[t]he Ad Hoc Committees were the most important part of the redistricting process." By getting the first crack at drawing the Council Districts, these committees enjoyed the advantage of setting the terms of future debate. Although the Commission and the City Council might later amend a committee's proposal on the margins, it would be difficult if not impossible to completely scrap a proposal and redraw the boundaries anew.

At the West/Southwest Committee's first meeting, Ellison had the Commission's Technical Director display a map of CD 10 with racial demographic data superimposed over it. He then had the Technical Director redraw CD 10 to maximize the percentage of African American registered voters. Ellison explained the changes in his proposed map in terms of how it would increase the African American voting population in CD 10. He explicitly stated that "[w]e attempted to protect the historical African American incumbents in this district by increasing the black voter registration percentage and CVAP #s accordingly."

This evidence certainly shows that race was *a* motivation in drawing CD 10. For Ellison and Wesson, it may have even been the only motivation. Ellison never offered any

justification other than race for his proposed boundaries.  But the relevant inquiry is whether "race was the *predominant* factor motivating the *legislature's* decision" as to the final boundaries.  *Cooper*, 137 S. Ct. at 1463 (emphases added).  And here, Plaintiffs have not made the requisite showing to raise a genuine dispute of fact.  Had Ellison been the final decision maker, then on this record Plaintiffs may have been able to make a compelling showing of predominance.  However, Ellison and Wesson were only two people in a process that incorporated multiple layers of decisions and alterations from the entire Commission, as well as the City Council.

Nor was Ellison's proposal adopted "as is."  After his proposal was forwarded to the Commission, the boundaries underwent additional review and changes.  First, the Commission released its proposed Council Districts (including Ellison's proposed boundaries for CD 10) for public comment and review.  After considering the public feedback, the Commission amended the proposed boundaries.  For CD 10, the Commission voted to place additional neighborhoods into the District, putting all of Little Bangladesh and around 70% of Koreatown[4] into CD 10.  The Commission then placed these amended boundaries before the public again for additional comment and review.  Afterwards, the Commission further amended its boundaries[5] and approved a "final" version.  The

---

[4] The actual percentage of Koreatown that the Commission voted to place into CD 10 depends on the definition used, e.g., 70%  if defined as the Wilshire Center-Koreatown Neighborhood Council, but 100% if defined by the City of Los Angeles' community renaming policy.

[5] Although not for CD 10.

Commission forwarded this "final" version to the City Council with additional recommendations that would further alter CD 10's boundaries from what Ellison originally proposed.[6]

Next, the City Council held its own public hearings regarding the proposed Council Districts and the Commission's recommendations. Members of the City Council then proposed their own adjustments to the Commission's proposal; three of these proposals would affect CD 10. The City's Chief Legislative Analyst reviewed these proposed changes along with the Commission's original proposal. Ultimately, the Legislative Analyst recommended adopting the Commission's proposal with 18 of the proposed adjustments, including the proposed changes to CD 10. Finally, on March 16, 2012, the City Council adopted the Legislative Analyst's recommended Council District boundaries.

Even viewed in the light most favorable to Plaintiffs, the record fails to show that these successive amendments were driven predominantly by racial considerations. Instead, the Commission's final report and recommendations show that, overall, the Commission sought to rebalance the populations in each Council District, while preserving communities and unifying as many Neighborhood Councils as possible in a single Council District. According to the Commission's report, 53 of 95 Neighborhood Councils had been divided across more than one Council District, and 13 of the 53 were divided across more than two Council Districts. Under the Commission's final proposed boundaries, the number of

---

[6] These recommendations would have kept businesses in the communities of Little Bangladesh, Little Ethiopia, and Koreatown within CD 10.

divided Neighborhood Councils was reduced from 53 to 29, and the number of Neighborhood Councils divided across more than two Council Districts was reduced from 13 to 3.

A memorandum to the Commission from its staff reflects these priorities. According to the memorandum, the amendments pertaining to Koreatown and its adjacent areas were adopted in response to public testimony expressing a desire to keep neighborhoods such as Little Ethiopia, Koreatown, and Little Bangladesh whole. In choosing to place Leimert Park and Baldwin Hills in CD 10, the Commission was responding to public testimony requesting that the entire Empowerment Congress West Area Neighborhood Development Council (of which Leimert Park and Baldwin Hills are a part) be placed in one Council District. Some of these neighborhoods had been divided across more than one Council District for at least forty years. Although Koreatown, as defined as the Wilshire Center-Koreatown Neighborhood Council, ultimately could not be brought into a single Council District, the Commission did succeed in reducing the split from three Council Districts to two.[7]

As for the amendments proposed by City Council members, the record lacks substantive evidence to show that they were proposed predominantly because of race, rather than in response to concerns raised during the public hearings. Plaintiffs allude to Council President Wesson's "huge sway" over the drawing of CD 10's boundaries, but aside from appointing Ellison to the Commission, they fail to point to any evidence showing how Wesson used his

---

[7] Under a narrower definition of Koreatown as discussed above, *see supra* note 4, the Commission succeeded in uniting Koreatown into a single Council District.

power and influence to pursue a race-based redistricting agenda. Wesson stated that his "priority" was to "make sure [they] have a black vote or two on that council," but he indicated in those same remarks that he was alone in prioritizing race in drawing the Council Districts. Wesson said that it was "[him] against twelve other members on the Council. [He] had no backup. [He] had no faction." These remarks tend to show that Wesson did not exert as much influence over the proceedings as he would have liked. Absent any additional evidence, Ellison's and Wesson's own subjective motivations are insufficient to make plaintiff's case that race predominated over the City Council's deliberations.

The circumstantial evidence also fails to create a genuine dispute on racial predominance. CD 10 is one of the most compact districts in Los Angeles, and its boundaries generally follow the boundaries of the Los Angeles Neighborhood Councils or other geographic markers. Moreover, CD 10 is not any more bizarrely shaped than it was with its previous boundaries. [8] *See* Appendix. This is a far cry from the cases in which the Supreme Court found the shape of voting districts to be indicative of racial considerations on their face. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 965–66 (1996) (describing a "compact, albeit irregularly shaped, core" with "narrow and bizarrely shaped tentacles . . . extending primarily to the north and west"); *Miller*, 515 U.S. at 908–09 (describing a "sparsely populated rural core" connected by "narrow corridors" to "four discrete, widely spaced urban centers"); *Shaw I*, 509 U.S. at 635–36 (describing two districts, one with a "hook shape[]"

---

[8] Expert analysis shows that 88.53% of CD 10's current boundaries either follow the Neighborhood Council boundaries or CD 10's original boundaries before redistricting.

with "finger-like extensions" and another that winds "in snakelike fashion" to encompass African American neighborhoods).

The demographic data and expert analyses fail to raise a genuine dispute on racial predominance as well. Not only is the increase in CD 10's African American CVAP from 36.8% to 40.5% relatively small, but looking at only the initial and final numbers also obscures what occurred in between. The Commission's proposal to the City Council originally increased African American CVAP to 43.1%. The City Council's final, approved version therefore reflects a *decrease* in CD 10's African American CVAP in comparison to the Commission's proposal. By placing most of Koreatown, which is predominantly Latino and Asian in population, in CD 10, the City Council diluted rather than concentrated African American voting power in that district. Moreover, the boundary segment analysis conducted by Plaintiffs' expert indicates that the current CD 10 does not appreciably concentrate African Americans inside CD 10 any more than the former CD 10 did.

Finally, the remaining procedural irregularities noted by Plaintiffs fail to suggest that race predominated over the drawing of Council Districts. Plaintiffs identify two Commissioners who were replaced after allegedly expressing reservations about the Commission's proposal. However, turnover on the Commission was not uncommon—six Commissioners were replaced between September 2011 and February 2012. The record does not clearly show that the two aforementioned Commissioners had concerns specifically about racial line drawing, as opposed to the overall proposal put forth by Ellison.

Plaintiffs also take issue with the Commission's use of ad hoc committees, but the Commission followed a similar

procedure to draw boundaries in 2002. Admittedly, the record does not provide a clear explanation on exactly why the West/Southwest Committee chose to forward Ellison's proposed boundaries to the Commission rather than Kim's, but Kim was able to present her proposal before the full Commission anyway. The Commission rejected Kim's proposal based on concerns that placing Koreatown in a single Council District would create major disruptions to other neighborhoods and Council Districts throughout the City. And, contrary to Plaintiffs' assertions, the use of ad hoc committees did not exclude the public from the redistricting process. The record indicates that the public was consulted continually throughout the redistricting process.

In sum, we conclude that Plaintiffs failed to raise a triable issue of fact as to whether the City was motivated predominantly by race in drawing CD 10, and the district court properly granted summary judgment in favor of the City.[9]

### B. Legislative Privilege Claim

Plaintiffs contend that the district court erred in barring the depositions of Ellison, Wesson, and other officials involved in the redistricting process. First, according to Plaintiffs, the legislative privilege does not apply at all to state and local officials. We disagree.

---

[9] The plaintiffs in the *Haveriland* action appeal the district court's summary judgment order as to CDs 8 and 9. Because the *Haveriland* plaintiffs merely joined in "the same arguments and analyses that were made in the Lee Appellants' Opening Brief," their appeal fails for the same reason.

The legislative privilege has deep historical roots that the Supreme Court has traced back to "the Parliamentary struggles of the Sixteenth and Seventeenth Centuries." *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). In *Tenney*, the Court reviewed a civil rights suit against members of a California state senate committee and a local city mayor, ultimately finding that such a suit could not proceed. *Id.* at 369. As the Court explained:

> In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense.

*Id.* at 373 (citation omitted). The Court's analysis drew on "political principles already firmly established in the States," as reflected in numerous state constitutions that had historically embraced just such a privilege for their own legislators. *Id.* at 373–75. Because the defendants had not "exceeded the bounds of legislative power" and "were acting in a field where legislators traditionally have power to act," the Court held that they were immune from suit.[10] *Id.* at 378–79.

While *Tenney*'s holding rested upon a finding of immunity, its logic supports extending the corollary

---

[10] While the privilege, as applied to federal officials, is embedded directly in the Constitution, its extension to state and local officials is a matter of federal common law. *See United States v. Gillock*, 445 U.S. 360, 372 n.10 (1980).

legislative privilege from compulsory testimony to state and local officials as well.  Like their federal counterparts, state and local officials undoubtedly share an interest in minimizing the "distraction" of "divert[ing] their time, energy, and attention from their legislative tasks to defend the litigation."  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975).  The rationale for the privilege— to allow duly elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box—applies equally to federal, state, and local officials. [11]  "Regardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference . . . ." *Bogan v. Scott-Harris*, 523 U.S. 44, 52 (1998).  We therefore hold that state and local legislators may invoke legislative privilege.[12]

Plaintiffs next argue that, even assuming the privilege applies to state and local officials, it is only a qualified right that should be overcome in this case.  Plaintiffs have failed to persuade us that the privilege was improperly applied here.

Although the Supreme Court has not set forth the circumstances under which the privilege must yield to the need for a decision maker's testimony, it has repeatedly stressed that "judicial inquiries into legislative or executive motivation represent a substantial intrusion" such that calling a decision maker as a witness "is therefore 'usually

---

[11] We recognize, however, that certain other concerns addressed by the legislative privilege are specific to federal legislators, such as the separation of powers principles that undergird the Speech and Debate Clause of the Constitution.  *See Gillock*, 445 U.S. at 370, 372 n.10.

[12] The privilege also extends to legislative aides and assistants.  *See Jeff D. v. Otter*, 643 F.3d 278, 290 (9th Cir. 2011).

to be avoided.'" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

In *Village of Arlington Heights*, the plaintiff brought an Equal Protection challenge against local officials, alleging that their refusal to rezone a parcel of land for redevelopment was motivated by racial discrimination. *Id.* at 254. While the Court acknowledged that "[t]he legislative or administrative history may be highly relevant," it nonetheless found that even "[i]n extraordinary instances . . . such testimony frequently will be barred by privilege." *Id.* at 268 (citing *Tenney*, 341 U.S. 367). Applying this precedent, we have likewise concluded that plaintiffs are generally barred from deposing local legislators, even in "extraordinary circumstances." *City of Las Vegas v. Foley,* 747 F.2d 1294, 1298 (9th Cir. 1984) (citing *Vill. of Arlington Heights*, 429 U.S. at 268).

We recognize that claims of racial gerrymandering involve serious allegations: "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens 'as individuals,' not "as simply components of a racial . . . class."'" *Miller*, 515 U.S. at 911 (quoting *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 602 (O'Connor, J., dissenting)). Here, Defendants have been accused of violating that important constitutional right.

But the factual record in this case falls short of justifying the "substantial intrusion" into the legislative process. *See Vill. of Arlington Heights*, 429 U.S. at 268 n.18. Although Plaintiffs call for a categorical exception whenever a constitutional claim directly implicates the government's intent, that exception would render the privilege "of little

value."  *See Tenney*, 341 U.S. at 377.  *Village of Arlington Heights* itself also involved an equal protection claim alleging racial discrimination—putting the government's intent directly at issue—but nonetheless suggested that such a claim was not, in and of itself, within the subset of "extraordinary instances" that might justify an exception to the privilege.  429 U.S. at 268.  Without sufficient grounds to distinguish those circumstances from the case at hand, we conclude that the district court properly denied discovery on the ground of legislative privilege.

**AFFIRMED.**

# APPENDIX

*Current CD 10 Boundaries*



*Previous CD 10 Boundaries*

